**WEST VIRGINIA GLASS SPECIALTY CO.
v. NATIONAL LABOR RELATIONS
BOARD.**

No. 5032.

Circuit Court of Appeals, Fourth Circuit.

March 25, 1943.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

W. G. Stathers, of Clarksburg, W. Va., and Herbert M. Blair, of Weston, W. Va., for petitioner.

Fannie M. Boyls, Senior Atty., National Labor Relations Board, of Washington, D.C. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, and Howard Lichtenstein, Asst. Gen. Counsel, and Jacob I. Karro and Eleanor Schwartzbach, Attys., National Labor Relations Board, both of Washington, D. C., on the brief), for respondent.

SOPER, Circuit Judge.

The National Labor Relations Board ordered the West Virginia Glass Specialty Company of Weston, West Virginia, an employer of labor, to cease and desist from dominating or interfering with the administration of the Independent Glass Decorators Union of West Virginia and from recognizing the Independent as the representative of its employees for the purpose of collective bargaining, and also to take affirmative action by withdrawing all recognition from the Independent and by posting appropriate notices in conspicuous places in its plant that it would abide by the terms of the order. The order was based upon findings by the Board that the employer had violated § 8(1) and (2) of the National Labor Relations Act, 29 U.S.C.A. § 158 (1, 2), by dominating, interfering with and supporting the Independent, and by anti-union conduct and statements of the company's officials. The company thereupon filed a petition in this court to review and set aside the order on the ground that the findings of the Board were not supported by substantial evidence.

An examination of the record reveals substantial evidence tending to support the

findings of the Board. Prior to 1940 the company, as a member of the National Association of Manufacturers of Pressed and Blown Glassware, had recognized the American Flint Glass Workers' Union of North America, commonly called the Flints, as the sole bargaining agency of its employees. In 1938 and 1939 the company suffered substantial losses and felt obliged in 1939 to reduce the scale of wages for its employees. It therefore withdrew from the Association and proposed a wage reduction to the Flints, and when this was refused, shut down its plant on February 26, 1940 for a period of two weeks. After the plant was reopened with a reduced wage scale the Flints called a strike in which most of the employees participated. Shortly after the reopening of the plant, the Board of Directors set up a plan which contemplated the formation of a workers' committee to whose approval all applications for employment were to be submitted. Provisions for hearing discharge grievances and for representation of the employees on the Board of Directors of the company were made. One share of stock was sold on credit to each of the returning employees and the indebtedness arising from these subscriptions was for the most part subsequently cancelled.

It was under these circumstances that the Independent came into being in the decorating department of the plant. There is evidence that it was formed after leading company officials, who were aggrieved that the Flints had refused to cooperate in meeting the current business difficulties, had offered advice and suggestions looking toward the establishment of an inside union. After the Independent was formed, the company promptly recognized it as the bargaining representative of the employees and entered into a working agreement with it which did not regulate the wages but provided for the procedure by which the Independent was to receive and hear charges against its members, and stipulated the penalties to be imposed upon members for failing to attend the union meetings. Subsequently, branches of the Independent were formed for the hot metal department and for miscellaneous workers. These branches were also promptly recognized by the company and agreements were made which related not only to the terms of employment but also to the government of the branches. Thus it appears that the internal regulation of the Independent and its branches was deemed by the parties to the agreements to be a matter subject to some extent to the control of the company. In addition there was evidence tending to show that company officials endeavored to prevail upon working employees and upon strikers to give up membership in the Flints and to join the Independent, and that the company gave its aid and support to the Independent in its social activities for the entertainment of the workers.

In an effort to offset this evidence the petitioner contends that in the main the statements and conduct derogatory to the Flints attributed to the company's officials were denied by them; that in every instance of conflict the examiner and the Board rejected the testimony of the company's officials who were men of integrity and good repute and accepted the testimony presented by their adversaries; that the testimony of the latter was shot through with inconsistencies and improbabilities and lacked corroboration which must have been available if the testimony were true. These arguments might be pertinent and persuasive if we were considering the evidence in an equity case or the finding of a judge sitting without a jury in a case at law. In these cases it would be our duty to decide whether the findings were clearly erroneous, and if so, to reverse the judgment. But such is not our function in reviewing the findings of the National Labor Relations Board. In so doing it is beyond our power to resolve conflicts in the evidence or even to inquire whether the findings of the Board are so clearly erroneous that an injustice has been done. In National Labor Relations Board v. Waterman S. S. Corp., 309 U.S. 206, 208, 209, 60 S.Ct. 493, 495, 84 L.Ed. 704, the court said:

" * * * It is of paramount importance that courts not encroach upon this exclusive power of the Board if effect is to be given the intention of Congress to apply an orderly, informed and specialized procedure to the complex, administrative problems arising in the solution of industrial disputes. As it did in setting up other administrative bodies, Congress has left questions of law which arise before the Board—but not more —ultimately to the traditional review of the judiciary. Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy

has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act."

Section 10(e) of the statute provides that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive"; and it has been repeatedly held that the Board's findings are to be given conclusive effect if supported by evidence sufficiently substantial to take a case to the jury. In National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660, the court said:

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' Consolidated Edison Co. v. National Labor Relations Board, supra [305 U.S. 197] 59 S.Ct. [206] 217 [83 L.Ed. 126], and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. See Baltimore & O. R. Co. v. Groeger, 266 U.S. 521, 524, 45 S.Ct. 169, 170, 69 L.Ed. 419; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720; Appalachian Electric Power Co. v. National Labor Relations Board, supra, [93 F.2d 985, at] page 989."

In the pending case substantial evidence was presented, which supports the finding of the Board, and a decree enforcing its order will therefore be entered.

Order enforced.