NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

W. L. RIVES COMPANY, Respondent.

No. 18273.

United States Court of Appeals Fifth Circuit.

March 15, 1961.

Rehearing Denied June 6, 1961.

Earle W. Putnam, Atty., N. L. R. B., Dominick Manoli, Associate Gen. Counsel, N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Stuart Rothman, Gen. Counsel, Melvin J. Welles, Attys., N. L. R. B., Washington, D. C., for petitioner.

Albert S. C. Millar, Jr., Hamilton & Bowden, Jacksonville, Fla., for respondent.

Before JONES and BROWN, Circuit Judges, and CARSWELL, District Judge.

JOHN R. BROWN, Circuit Judge.

The question here is whether an employer "caught 'between the devil and the deep blue,'" N. L. R. B. v. Radio and Television Broadcast Engineers, 1961, 364 U.S. 573, 81 S.Ct. 330, 332, 5 L.Ed.2d 302, through a jurisdictional controversy was guilty of unfair labor practice, refusal to bargain and discriminatory refusal to rehire strikers under § 8(a) (1, 3, 5). 29 U.S.C.A. § 158(a) (1, 3, 5), when it farmed out the disputed work to a subcontractor. The Board so held. We reverse.

The hapless, helpless victim of this internecine struggle who now finds itself faced by a third protagonist through the Board's order was the Employer, W. L. Rives Company. Rives manufactures and fabricates to order corrosion resistant pipe and fittings, principally of stainless steel for installation in industrial machinery. When the product is finally a part of the industrial machine, it will have gone through three principal phases: (1) the manufacture or fabricating of the parts (includes pipe, tubing, elbows, T's, and S's); (2) fitting or assembly of these parts together in a shop; and (3) installation of this "fitted" equipment into the machine at the final job-site. Rives did not perform step (3). It regularly did steps (1) and (2).

While Rives did not ever perform step (3), it was at this phase that all of the trouble began. This was essentially in the field of the construction trades. In this area the dominant union was United Association of Pipe Fitters,[1] hence the frequent reference to the "UA label."

[1. United Association of Journeymen Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO.]

This Union included the separate crafts which customarily performed step (2) operations and others which did step (3). It was not, however, concerned with step (1) the initial manufacture or fabrication. But throughout a major segment of the construction industry, it had imposed an absolute requirement that its members would not perform the step (3) final installation unless the step (2) shop assembly work had also been performed by its members. This requirement could only be surmounted if the union would "accept" or give its approval to material not bearing the UA label.

The result was that a concern doing (1) and (2) was at the mercy of UA. Rives had long experienced this fact of life. In soliciting work among contractors and subcontractors, Rives knew that it could not get a bid unless it could give assurances that pipe fabricated and fitted by it (step (1) and (2) work) would be given clearance by UA. Prior to the time its shop became unionized in November 1957, Rives presumably had not had too much difficulty in obtaining this clearance. This was obtained through Bryan, the Jacksonville, Florida representative of UA. Occasionally Bryan had to go through the international office at Washington. Whatever steps Bryan, or Bryan and Rives together, had to take, the clearance was routinely effectuated by Bryan notifying the UA Local at the job site that the Rives' work was "fair." From all that appears this went along smoothly with the best of cordial relations. There was not then, nor was there ever, any hostility by Rives to UA or to any other union or to trade unionism generally.

Nor did the introduction of a new union into the picture alter things. After a Board-conducted election, Sheet Metal Workers [2] was certified in November 1957 as the bargaining representative of Rives' employees engaged in operations (1) and (2). But the representative of Sheet Metal Workers knew of the imperative necessity that Rives get UA clearance if it were to bid on many jobs opening up. Following the certification extended negotiations commenced looking toward a collective bargaining agreement. During that time Rives with the knowledge, and on some occasions, active assistance of representatives of Sheet Metal Workers, consulted with Bryan to obtain such clearance for specific proposed jobs. And during all of these contract negotiations—as to which there is not even the slightest whisper of dilatory feet-dragging, shadow-boxing, or dissimulation of any kind—it was recognized by both sides that this was the real problem. Rives naturally took the position that Sheet Metal Workers had to assure that work performed by its members could be sold and delivered as "fair." Sheet Metal Workers, on the other hand, recognizing full well the Employer's predicament took the practical view that it could not guarantee what other workers would do, even though they were all trade unionists and now part of one big family (AFL-CIO).[3]

While all of this was going on in the best of spirits, the Bowater job opened up for a substantial subcontract on the huge plant being built in Tennessee for the Bowater Paper interests. As usual, there was the question of UA clearance. Sheet Metal Workers could then give no assurance but it cooperated actively with Rives as discussions were carried on with Bryan. Bryan advised that UA would clear the work even though step (2) would be done by members of Sheet Metal Workers. On the strength of this, Rives submitted its bid as a subcontractor to Jamison who had the contract with

2. The Sheet Metal Workers International Association, AFL–CIO, Local 571.

3. The Board insists, perhaps obliquely, that with the Unions being separate legal entities the position of Sheet Metal Workers was so eminently correct, that of Rives so patently unobtainable, that this itself proved bad faith bargaining. Establishing again that the pudding's proof is its edibility, the final contract of September 1938 provided precisely this guaranty to Rives.

Bowater. After Bowater and Jamison's acceptance of the bid,[4] Rives purchased materials costing approximately $90,000 and became obligated for a $7,000 nonperformance penalty.

Up to this point no one was angry. Everyone was presumably happy. Rives had a new contract. His own employees, members of Sheet Metal Workers, had the prospect of continuous and profitable work. Bryan and UA were likewise content. Employer and employees alike were busy with work and the contract negotiations continued without acrimony.

Then came the blow. Bryan suddenly advised that he had been overruled by "Washington." The UA clearance was withdrawn. Now all faced a crisis. Under great tension every appeal was made by Rives by and through Bryan to highly placed international officers of both Unions. Intercession of congressional and political representatives was likewise pursued. Sheet Metal Workers, vitally interested, was aware of all of this. But these efforts were unavailing. Clearance from UA could not be obtained. What was Rives to do? Apprehending that these appeals would be unfruitful, Rives had discussed with Sheet Metal Workers representatives the possibility that the work would have to be subcontracted to a UA shop. By meetings with employees and their shop committees, all were conscious of the urgency. After conferences among Bowater, Jamison and Rives, it was determined about June 14 that subcontracting was the course to take. Before it was done, Rives an-

nounced to a meeting of all of its employees the fact that a subcontract was being made for all of the step (2) fitting work for the Bowater contract. This was to be accomplished under a contract with Jamison on a cost-plus-fixed-fee basis. A portion of Rives' plant was marked off for Jamison's operations. The step (1) parts fabricated by Rives were turned over by Rives' employees to Jamison's men. Jamison's men then performed the step (2) fittings.

At the time this was done and the announcement made to employees of Rives, they were assured that this would not affect anyone's job and pay or work would not be reduced. In the changeover there was some slight confusion and some of Rives' employees were engaged in tasks not ordinarily performed, although of a type occasionally done by them. Their regular, full pay continued without any reduction.

Despite these assurances the Board found that the employees were restive over the subcontracting and this led them first to file an unfair labor practice complaint on June 27 and on July 1 the men went out on a strike.[5] Collective bargaining negotiations continued during the strike. On September 25 the contract was agreed on and the strike ended. All strikers were rehired except six. Rives treated them as economic strikers who had been replaced. The Board held them to be unfair labor practice strikers and ordered their reinstatement. As we pointed out above, note 3, supra, in the contract Sheet Metal Workers guaran-

4. The instructions for bidding stated " * * * Quote us your price for the fabrication of these three sections of work * * *. All fabricated pieces to be marked with the U.A. label."

This was more euphemistically stated on the front side in these terms: "Fabrication of this material to be performed under conditions and shop practices which will permit erection by Field Forces normally used and now in our employ."

The quoted language was in the February 1958 request for quotation. How-

ever in the request of April 25, 1958 it was stated:

"Referring to our original inquiry letter dated Feb. 18/58, we are now asking you to delete all reference to our sentence regarding U.A. label, and no reference will be made to this label in your quotation."

5. A strike by the construction trade Sheet Metal Local No. 435 against members of the Jacksonville Sheet Metal and Roofing Contractors Association began the same day.

teed acceptance of the work [6] and thereby for itself recognized that if Sheet Metal Workers failed in this undertaking Rives, as the Employer, was free to subcontract out such work in the future or hire UA workers to perform the work.

As we view it, and as did the Board, the whole thing turns finally on whether the making of the subcontract with Jamison was permissible. If it was, the strike was an economic one thus affording no right to automatic reinstatement under § 8(a) (3). Nor would it amount to a § 8(a) (1) interference. Such a conclusion would not automatically erase the Board's further holding that the circumstances of making an otherwise permissible subcontract were such as to constitute a § 8(a) (5) refusal to bargain.

As to this conclusion of refusal to bargain, we would say at the outset there is simply no evidence to warrant that conclusion. The likelihood of subcontract as the only way out was discussed and recognized on several occasions, both in the bargaining sessions and in the crisis precipitated by the despotic withdrawal of UA clearance on the Bowater job. Indeed, there was no violent opposition to the general notion of subcontracts. What concerned Sheet Metal Workers representatives was the making of an agreeable contract. It is true that no impasse, as that term is usually thought of had yet been reached on that issue. But the action was not taken to affect the course of negotiations or to undermine the effectiveness of the Union as the bargaining agent in the eyes of its members. Cf. N. L. R. B. v. Herman Sausage, 5 Cir., 1960, 275 F.2d 229; N. L. R. B. v. J. H. Rutter-Rex Manufac-

turing Co., 5 Cir., 1957, 245 F.2d 594, 597; Armstrong Cork Co. v. N. L. R. B., 5 Cir., 1954, 211 F.2d 843, 847; N. L. R. B. v. Booker, 5 Cir., 1950, 180 F.2d 727, 728, 730; N. L. R. B. v. Whittier Mills Co., 5 Cir., 1940, 111 F.2d 474, 478. It was done to meet a pressing crisis that affected the immediate and overpowering financial interests of these employees and Rives, the Employer. Bargaining was to go on. Indeed, the action was taken to make it possible for there to be something to bargain about—the continued existence of a solvent employer able to hire, pay and use willing workers.

We are of a like view that there is no support for the conclusion that this conduct constituted a "discrimination in regard to * * * employment * * * to encourage or discourage membership in any labor organization" under § 8(a) (3). In the peculiar setting of this case we think the element of discriminatory practice in regard to "hire or tenure of employment or any term or condition of employment * * *" was lacking. Of course in assaying this, we are mindful that it is something more than a simple question of money wages as such. N. L. R. B. v. Waterman Steamship Corp., 1940, 309 U.S. 206, at page 218, 60 S.Ct. 493, 84 L.Ed. 704. Other things such as seniority, Olin Matheson Chemical Corp. v. N. L. R. B., 4 Cir., 1956, 232 F.2d 158, or transfers, Continental Oil Co. v. N. L. R. B., 10 Cir., 1940, 113 F.2d 473, 484, are important, sometimes decisively so.[7]

But here there was nothing done or intended which in any way disparaged the employees either singly or as a group. Their pay remained exactly as it had. They were given full work with no reduction either in hours worked or the

6. The contract provided:
"Article XVII
"*Acceptance of work and products.*
*Union Label*
"A. The Union agrees that it will immediately and diligently proceed to do all things necessary to provide for the acceptance of work and products of the Company by any other union or company as the case may be. * * *"

7. See also N. L. R. B. v. Star Publishing Co., 9 Cir., 1938, 97 F.2d 465; N. L. R. B. v. Gluek Brewing Co., 8 Cir., 1944, 144 F.2d 847; South Atlantic SS Co. v. N. L. R. B., 5 Cir., 1941, 116 F.2d 480, certiorari denied, 313 U.S. 582, 61 S.Ct. 1101, 85 L.Ed. 1538.

applicable pay scale. The only difference was that step (2) operations on material destined for Bowater was now performed by the independent contractor Jamison.[8] Rives' men did step (1) work on this and all other jobs exactly as they had in the past. They performed step (2) work on all jobs other than Bowater.[9] When they were not busy with this work, other tasks were found. These were of the kind to which the men were occasionally assigned in the past. None of this work was menial or in any sense degrading, likely to embarrass or humiliate any of the men in the eyes of fellow workers.

Whatever doubt there might be on this score when "discrimination" is viewed as a single element, there can be none when viewed, as the statute does, by coupling discrimination with the prohibited effect to "encourage or discourage membership in any labor organization." § 8(a) (3).

█ We must recognize, of course, that this is not merely an inquiry into the subjective purpose of an employer at the time the questioned action is taken. "This recognition that specific proof of intent is unnecessary where employer conduct inherently encourages or discourages union membership is but an application of the common law rule that a man is held to intend the foreseeable consequences of his conduct." Radio Officers Union v. N. L. R. B., 1954, 347 U.S. 17, 45, 74 S.Ct. 323, 338, 98 L.Ed. 455. But the essence of any such objective test and inquiry into what the "foreseeable consequences" of an act may be is the probable impact in the light of existing conditions. Conduct likely to encourage or discourage union activity in one surrounding might have quite a different consequence in another environment. The test does not seek the law's

answer to some hypothetical problem. The answer, as the problem, would thus be academic only. The law takes the parties as it finds them. Against that background is the question then propounded: in all reasonable likelihood would this specified conduct encourage [or discourage] union membership?

All of this is vitally important here. For here we have no usual situation. We have no tension, distrust or hostility bred by strong unyielding partisan demands or like hard-headed intransigent refusal on the other. This was a case of workers presumably happy with their work and with their employer. No resistance to unionizing the shop was ever intimated. The Employer accepted the election result and all undertook then to negotiate in the best of faith. There was, to be sure, this problem of UA clearance. It was serious and it took over nine months to work out. But each regarded this an actuality with no suspicion on the part of either that it was being artfully employed as a foil. The Jamison subcontract was not resorted to in order to dissuade employees to forego Sheet Metal Workers. On the contrary, every effort by Rives was to have Sheet Metal Workers, as the responsible bargaining agent for the employees, guarantee practical acceptability of their work.

All of this is made doubly clear by the Board's express finding. "Admittedly * * * [Rives] was not actuated by a desire to discriminate against its employees or by an antiunion animus. Its wish was to assure compliance with its contract" with Bowater. And in the most categorical terms the Board rejects any purpose to encourage or discourage a given union. For it went on to state that Rives " * * * had no design to punish employees for having chosen the

---

8. There is not, nor can there be, any suggestion that the subcontract was merely a subterfuge. Based as it was on a cost-plus scale at the UA hourly rate of pay, which was considerably higher than that payable by Rives to Sheet Metal Workers, is represented a real cost increase to Rives.

9. Later on and near the time the contract was consummated and the strike terminated, step (2) work on two other jobs was also done by Jamison under subcontract.

Sheet Metal Workers, or to encourage them to join the Pipefitters * * *."

■ Obviously we do not regard this lack of subjective intent as an automatic insulation. But its presence and the Board's finding concerning it is of great importance. It is important as a dominant factor which is reflected in all other circumstances and against which Rives' conduct is to be judged in terms of its likely effect. The answer to that question in this setting is not controlled by what the answer has been, or might be, in another atmosphere.[10]

■ What we have said is likewise applicable to the Board's additional conclusion that this violated § 8(a) (1). In the circumstances of this case the making of the Jamison subcontract to meet the peculiar problem of such vital importance to Sheet Metal Workers, its members, and the employer as well was not intended as, and did not have the effect of, interfering with, restraining or coercing employees in any of their § 7 rights. The employees remained, and were expected to remain, loyal to Sheet Metal Workers. Sheet Metal Workers was the sole bargaining agent and it successfully achieved its mission.

The result is that we find no substantial support for the Board's conclusion and order that the making of the Jamison subcontract violated § 8(a) (1), §

8(a) (3) or § 8(a) (5) of the Act. The whole order falls including the provision for reinstatement of those not rehired on the termination of the strike.

Enforcement denied.

---

10. See, e.g., N. L. R. B. v. Goodyear Tire & Rubber Co., 5 Cir., 1942, 129 F.2d 661, 664; N. L. R. B. v. Richards (Freight Lines Equipment Co.), 3 Cir., 1959, 265 F.2d 855; N. L. R. B. v. Bell Aircraft Corp., 2 Cir., 1953, 206 F.2d 235, 237; N. L. R. B. v. Star Publishing Co., 9 Cir., 1938, 97 F.2d 465; N. L. R. B. v. Gluek Brewing Co., 8 Cir., 1944, 144 F.2d 847.

The Board in note 4 of its report stated:

"4. It has been repeatedly held that threats of economic reprisal by third parties (Idaho Potato Growers, 144 F.2d 295, 302–3 (C.A.9), possibility of economic loss, or business motivation are not justifications of unfair labor practices. Republic Aviation, 324 U.S. 793 [65 S.Ct. 982, 89 L.Ed. 1372]; National Broadcasting Co., 150 F.2d 895, 900 (C.A.2); General Motors Corp., 59 N.L.R.B. 1143,

1154–5, enf'd 150 F.2d 201 (C.A.3); West Virginia Glass Co., 134 F.2d 551 (C.A. 4); Goodyear Tire & Rubber Co., 129 F.2d 661, 664 (C.A.5); Atlas Underwear Co., 116 F.2d 1020 (C.A.6); Hudson Motor Co., 128 F.2d 528 (C.A.6); Allis Chalmers Mfg. [Co.], 162 F.2d 435 (C. A.7); Wilson & Co., Inc., 123 F.2d 411, 417 (C.A.8); Graham Ship Repair Co., 159 F.2d 787 (C.A.9); Wells, Inc., 162 F.2d 457 (C.A.9); Polson Logging Co., 136 F.2d 314 (C.A.9)."

This really begs the question. Obviously threats of economic reprisal cannot justify an "unfair labor practice." But in the instant case subcontracting was an "unfair labor practice" only if in this setting it had the probable effect of encouraging or discouraging union membership.