NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

W. L. RIVES COMPANY and W–M
Corporation, Respondent.

No. 19845.

United States Court of Appeals
Fifth Circuit.

Feb. 13, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Janet

G. Kohn, Atty., N.L.R.B., Washington, D. C., for petitioner.

O. R. T. Bowden, Robert E. Sheridan, Jacksonville, Fla., for respondent.

Before RIVES, LEWIS,* and BELL, Circuit Judges.

RIVES, Circuit Judge.

This case is before the Court upon petition of the National Labor Relations Board pursuant to section 10(e) of the National Labor Relations Act, 29 U.S. C.A. § 160(e), for enforcement of its order[1] finding W. L. Rives Company and W-M Corporation to have committed unfair labor practices in violation of sections 8(a) (2), (3), (5) and (1) of the Act, as amended, 29 U.S.C.A. §§ 158(a) (2), (3), (5) and (1).

The controversy stems from a jurisdictional dispute which relates back to 1957 and which was the subject of this Court's opinion in N. L. R. B. v. W. L. Rives Co., 5 Cir. 1961, 288 F.2d 511. A full statement of the events occurring in 1957 and 1958 may be found in that opinion. The operations of the W. L. Rives Company (hereinafter "Rives Company") in 1957 were succinctly described as follows:

"Rives manufactures and fabricates to order corrosion resistant pipe and fittings, principally of stainless steel for installation in industrial machinery. When the product is finally a part of the industrial machine, it will have gone through three principal phases: (1) the manufacture or fabricating of the parts (includes pipe, tubing, elbows, T's and S's); (2) fitting or assembly of these parts together in a shop; and (3) installation of this 'fitted' equipment into the machine at the final job-site. Rives did not perform step (3). It

regularly did steps (1) and (2)." 288 F.2d at 512.

As to the performance of step (3), the dominant union was the United Association of Pipe Fitters[2] (hereinafter, "UA"):

"This Union included the separate crafts which customarily performed step (2) operations and others which did step (3). It was not, however, concerned with step (1) the initial manufacture or fabrication. But throughout a major segment of the construction industry, it had imposed an absolute requirement that its members would not perform the step (3) final installation unless the step (2) shop assembly work had also been performed by its members. This requirement could only be surmounted if the union would 'accept' or give its approval to material not bearing the UA label." 288 F.2d at 513.

As a result, instructions received by the Rives Company for submitting bids frequently stipulated that the pre-fitted material supplied must conform to UA requirements. Prior to November 1957, Rives Company was able to secure clearance as needed from the local UA representative. However, a Board election in November 1957 resulted in certification of Sheet Metal Workers[3] (hereafter, "SMW") as exclusive bargaining representative of all production employees of Rives Company. There was no hostility by Rives Company to SMW, UA, or to trade unionism generally.

In the Spring of 1958, after obtaining an assurance of UA clearance from the local union representative, Rives Company bid successfully on a substantial subcontract and thereafter purchased $90,000 worth of materials for the job

---

* Of the Tenth Circuit, sitting by designation.

1. 136 N.L.R.B. No. 84 (April 13, 1962).

2. United Association of Journeymen Apprentices of the Plumbing and Pipe Fit-

ting Industry of the United States and Canada, AFL-CIO.

3. Sheet Metal Workers International Association, AFL-CIO, Local 571.

and became obligated for a $7,000 non-performance penalty. Suddenly UA's national headquarters withdrew clearance. When the Company's efforts to acquire this clearance failed, it arranged to subcontract the step (2) fitting work to a UA employer, a possible solution which had already been discussed with SMW representatives during contract negotiations then in process. Rives Company announced this arrangement to a meeting of its employees and assured them that their jobs would not be affected. Nevertheless, concern for their jobs not allayed, the Rives Company employees struck when the independent contractor's UA men appeared in the Rives Company plant, a portion of which had been set aside for their use. An unfair labor practice complaint was filed, and the Board held that Rives Company had violated sections 8(a) (1), (3) and (5) of the Act.

By its prior opinion this Court denied enforcement of the Board's order. It was held that there was no section 8(a) (5) refusal to bargain because the likelihood of subcontracting as the only way out was discussed with the SMW on several occasions and, although there was no impasse, the action was taken "to meet a pressing crisis that affected the immediate and overpowering financial interests of these employees and Rives, the Employer." 288 F.2d at 515. It was held that there was no violation of sections 8(a) (3) or (1) because the actions of the Company in no way disparaged its employees and because, in all reasonable likelihood, the conduct neither encouraged nor discouraged union membership.

Unfortunately, Rives Company's problems were not over. Throughout 1959 and most of 1960, the Company was unable to bid successfully on contracts requiring UA approval because it could not obtain such clearance. Facing possible financial crisis, Walter L. Rives, President of W. L. Rives Company, conceived of a method whereby he could offer UA-approved products: Mr. and Mrs. Rives, who were majority stockholders in W. L. Rives Company, were also majority stockholders in W-M Corporation. W-M, having been in existence since 1955, owned the land on which the Rives Company plant was located. Mr. Rives proposed that W-M build a UA fit-up shop next door to the Rives Company plant. W-M would bid on those contracts requiring UA approval; it would then subcontract the step (1) manufacturing to Rives Company, but do the step (2) fitting itself.

In August 1960, Mr. Rives met with a representative of UA Local 234 and discussed his plans for the W-M plant. On August 16, W-M Corporation executed a license agreement with UA entitling it to use the UA label on pipe assembled at the new plant, provided that W-M would sign a collective bargaining contract with UA. Construction on the W-M plant began in September; and on September 16, while the building was still going up and before any employees had been hired, W-M through President Rives entered into a collective bargaining agreement with UA Local 234 recognizing that union as exclusive bargaining agent. Also in September, SMW began bargaining with Rives Company about proposed modifications in its bargaining contract, which was to expire on September 30. Throughout these bargaining sessions, SMW was not informed of the purpose of the new plant nor of the negotiations, license agreement, or contract between W-M and UA. Finally, around October 19, about the time production began in the new plant, SMW was informally notified of the contract with UA.[4] A strike

4. Willis H. Wilson, president of the SMW local testified:
"Q. Was anything brought up then at this meeting of October 19 about the work being done in the new plant?
"A. Right at the last of the meeting when it was adjourned or discussion ended, we were fixing to get up and leave, and I think Mr. White [of SMW] was the one that asked the question why they could pay the pipefitters over there the amount of money they were paying them and couldn't see fit to give us 12 cents an hour increase in wages.
"Q. Did Mr. Rives answer anything to this remark?

vote was taken on October 20, and on October 27 an unfair labor practice charge was filed by SMW, and almost the entire work force of the Rives Company plant went out on strike. Although the bargaining sessions continued, there was no discussion as to the problem of the new plant, and on November 10, 1960 agreement was reached on the modifications of the SMW contract. However, on that date most of the strikers were notified that they had been replaced and discharged. The strike was never officially terminated.

The Trial Examiner found that the respondents had not engaged in any unfair labor practices.[5] Nevertheless, the Board found that the respondents violated sections 8(a) (5), (3), (2) and (1) of the Act. Treating W. L. Rives Company and W-M Corporation as a single employer,[6] the Board held that the prehire agree-ment with UA Local 234 violated sections 8(a) (2) and (1) of the Act; that the failure to give notice and opportunity to bargain violated section 8(a) (5); that respondents' conduct was discriminatory, had the foreseeable effect of discouraging membership in SMW and encouraging membership in UA Local 234, and was in derogation of the representative status of SMW, thus violating section 8(a) (3) and (1); and that the strikers were unfair labor practice strikers so that their discharge violated section 8(a) (3).

 We are of the opinion that for the purposes of effectuating the policies of the National Labor Relations Act it was not error for the Board to treat W. L. Rives Company and W-M Corporation as a single employer.[7]

 Respondent [8] admits that the exclusive recognition of UA as bargain-

---

"A. Well, I think the discussion by all three of the company's parties involved in the dealing with Mr. White and the rest of us, I assume [was] that there was only going to be a small precentage of the work done at the W-M Corporation. I think they had brought it down to about five per cent, something like that. And that if— with this U.A. label, it would probably guarantee more work for all of us in the long run, but there was no specific guarantee of what percentage of the work we would get. It was all verbal discussion.

"Q. Do you remember if Mr. Rives said anything else at this time?

"A. Yes. He made a statement to Mr. Kupfer [of SMW] that he had signed some kind of an agreement with Mr. Leo Hill, the pipefitters [UA], and he pulled a piece of paper out of his desk and started to show it to Mr. Kupfer. Then he thought better of it and said, 'No, I'd better not show it to him.'

"Q. Then was it at that point that the meeting ended?

"A. At that point the meeting ended, yes."

5. One of the alternative grounds for the Trial Examiner's decision was that the determination in the prior Rives case was res judicata to all of the issues presented in this case. The Board was clearly correct in rejecting this conclusion. The doctrine of res judicata does not apply where, as here, the second suit is based on a separate and distinct cause of action. Commissioner v. Sunnen, 1948, 333 U.S. 591, 597–598, 68 S.Ct. 715, 92 L.Ed. 898. Of course, where the parties are the same, the doctrine of collateral estoppel operates as to those matters actually litigated and determined in the first proceeding. Ibid.; Lawlor v. National Screen Service Corp., 1955, 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122. However, the complaint in the instant case is based upon facts which are at best analogous to those in the prior decision, in which instance collateral estoppel may not apply to the conclusions of law reached thereon. See also note 19, infra.

6. "Walter Rives and his wife are president and secretary, respectively, of both companies and the majority stockholders in each. Walter Rives determines labor policies and conducts negotiations for both companies. Upon the entire record, we find that Rives [Company] and W-M constitute a single employer under the Act and are jointly responsible for the unfair labor practices found hereinafter." 136 N.L.R.B. No. 84, at n. 3 (April 13, 1962).

7. See note 6, supra. Compare N. L. R. B. v. Rapid Bindry, Inc., 2 Cir. 1961, 293 F.2d 170, 171.

8. I.e., Rives Company and W-M treated as a single employer.

ing representative at the new plant without majority representation and prior to the hiring of employees violated sections 8(a) (2) and (1) of the Act unless the exemption contained in section 8(f) applies. See International Ladies' Garment Workers' Union v. N. L. R. B., 1961, 366 U.S. 731, 738, 81 S.Ct. 1603, 6 L.Ed.2d 762; Dixie Bedding Manufacturing Co. v. N. L. R. B., 5 Cir. 1959, 268 F.2d 901, 905. Section 8(f), 29 U.S.C.A. § 158(f), was added by section 705(a) of the Labor-Management Reporting and Disclosure Act of 1959, and provides that an employer "engaged primarily in the building and construction industry" may make an agreement with a union covering employees who will be engaged in that industry, even though the majority status of the union has not been established in accordance with section 9. As of this time, so far as we are advised, no court has determined the scope of the "building and construction industry" referred to in section 8(f). We are of the opinion that Congress did not intend to include in the exemption those employers who manufacture and assemble products which are subsequently installed by others at the construction site.[9] Although the Trial Examiner found that the pre-hire agreement violated the Act, he stated it would neither accomplish anything nor effectuate the policy of the Act to set aside the contract and withhold UA recognition until the union is certified. We hold that it was correct for the Board to reverse the Trial Examiner and grant such relief based on the illegal agreement.[10]

In its brief before this Court, the petitioner appears to argue that since Rives Company and W-M are to be treated as a single employer, the W-M plant was an accretion of the Rives Company plant and its employees were part of the certified bargaining unit. If this is so, then to bargain with UA concerning a portion of this unit would violate section 8(a) (5). However, as the Trial Examiner pointed out, the complaint makes no such claim, and SMW did not demand recognition as the representative of the employees at the W-M plant.[11] The Board's decision does not refer to the Trial Examiner's finding on this issue and seems to treat the employees at the W-M plant separately from the unit certified at the Rives Company plant. For purposes of this case, therefore, we think that the employees at the W-M plant should not be treated as part of the certified unit.

The petitioner also points out that it is a refusal to bargain within the terms of section 8(a) (5) if an employer unilaterally changes the conditions of employment without consulting the exclusive bargaining agent and without granting it an opportunity to negotiate on the proposed changes. See Armstrong Cork Co. v. N. L. R. B., 5 Cir. 1954, 211 F.2d 843. Such changes in the "conditions of employment" have been held to include the granting of wage increases or other benefits and the withdrawal of proposed increases,[12] the discontinuance of part of the business so as to cause many employees to lose their jobs,[13] and

9. Cf. 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 at 1082, 1577–78 (1959). It is true that W-M hired employees on a job-by-job basis; however, the fact that the Rives Company used a continuous and regular complement of employees to perform fit-up work indicates that employment in the step (2) process is not inherently casual and intermittent, as is job-site employment in the construction industry.

10. There is no doubt that SMW could properly bring this charge since even strangers to a labor contract may file charges. See Southern Furniture Mfg. Co. v. N. L. R. B., 5 Cir. 1952, 194 F. 2d 59, cert. denied, 343 U.S. 964, 72 S.Ct. 1057, 96 L.Ed. 1361 (1952).

11. See note 21, infra.

12. E.g., Armstrong Cork Co. v. N. L. R. B., 5 Cir. 1954, 211 F.2d 843; N. L. R. B. v. Citizens Hotel Co, 5 Cir., 1964, 326 F.2d 501.

13. E.g., Order of Railroad Telegraphers v. Chicago & No. W. Ry., 1960, 362 U.S. 330, 336, 80 S.Ct. 761, 4 L.Ed.2d 774; N. L. R. B. v. Rapid Bindry, Inc., 2

the subcontracting of a particular class of work with the termination or transfer of all the employees formerly engaged therein.[14] The petitioner argues that "since the transfer of functions from the Rives [Company] plant to W-M, like a subcontract of work previously performed by employees, curtails the employee's work opportunities, it too is an alteration of existing conditions of employment concerning which the bargaining representative must be consulted."

The Board's decision also states that "work of the type which had theretofore been performed by Rives' employees [in the Rives Company plant] was transferred to the newly-hired employees in the W-M plant." We conclude that there is nothing in the record to indicate that there was such a transfer of work. It is undisputed that W-M bid and performed step (2) work on only those contracts requiring the UA label. It is likewise undisputed that prior to the decision to build the new plant Rives Company was not able to bid on or perform such contracts because of its inability to obtain UA approval. Thus the Rives Company employees performing step (2) operations did the same amount of work as they would have done if the new plant had not been operating. The only effect on the employees engaged in step (1) operations was an increase in work because of the employer's ability to obtain more contracts. There are no indications of any planned change in the number of employees at the Rives Company plant doing either step (1) or step (2) work or in their manner of performance. In each of the cases where a change in the conditions of employment was found, there was a change in either the wages or benefits given the employees, the length or term of employment, or the type of work performed. Of course, there might be additional ways in which the conditions of employment would be changed, but we hold that a mere planned increase in the volume of work to be performed by some of the employees because of a planned increase in the volume of the employer's business, by itself, is not an action which requires prior notice and consultation with the exclusive bargaining agent.[15]

The Board found a section 8(a) (3)[16] violation on the following basis:

"The result of Respondent's unilateral conduct was to deprive employees represented by SMW of work

---

Cir. 1961, 293 F.2d 170 (all work transferred to another plant).

14. E. g., N. L. R. B. v. Brown-Dunkin Co., 10 Cir. 1961, 287 F.2d 17, 20; Local 1304, East Bay Union of Machinists v. N. L. R. B., D.C.Cir. 1963, 322 F.2d 411, cert. granted sub nom. Fiberboard Paper Products v. N. L. R. B., 1963, 84 S.Ct. 490. But see, N. L. R. B. v. Adams Dairy, Inc., 8 Cir. 1963, 322 F.2d 553 (apparently requiring intent to discriminate in order to constitute a § 8(a) (5) violation). Compare United Steelworkers v. Warrior & Gulf Navigation Co., 5 Cir. 1959, 269 F.2d 633, reversed, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409.

The court in Brown-Dunkin, supra, noted: "This is not to say that the Union must first approve before an employer may contract out work, but it is to say that reasonable notice and a chance to bargain must be afforded before an employer enters into a contract *affecting the hire and tenure of its Union work-*

*ers' employment."* 287 F.2d at 20. (Emphasis added.)

15. We do not decide under what circumstances an actual transfer of work would be a change in the conditions of employment. We also do not decide whether the union contractually waived the right to bargain about the new plant. See note 19, infra. As to waiver by action or inaction, see generally, Armstrong Cork Co. v. N. L. R. B., supra, note 12, 211 F.2d at 848; N. L. R. B. v. Southeastern Rubber Mfg. Co., 5 Cir. 1954, 213 F.2d 11, 15.

16. Section 8(a) (3), 29 U.S.C.A. § 158(a) (3), reads as follows:
"(a) It shall be an unfair labor practice for an employer—
" * * *
"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

of the type which they had previously performed because they were members of the 'wrong' union, and to transfer such work to employees who were members of Pipefitters Local 234, the intended purpose being that Respondent might thereafter deal with Pipefitters Local 234 respecting that work. Clearly, Respondent's conduct had the foreseeable effect of discouraging membership in SMW and encouraging membership in Pipefitters Local 234 and was in derogation of the representative status of SMW."

In order to find a section 8(a) (3) violation it is necessary to either prove or infer (1) that the employer discriminated as to "hire or tenure of employment or any term or condition of employment," (2) that this discrimination encouraged or discouraged membership in any labor organization, and (3) that this was done intentionally.[17] We hold that in the instant case the discrimination required by the Act is lacking.[18] We have already shown that there was no transfer of work and that there were no changes in the terms or conditions of employment of the Rives Company employees. It is true that higher wages were paid at the W-M plant than at the Rives Company plant, but this can be explained by the fact that W-M employees were hired only on a job-to-job basis whereas Rives Company employees had continuous employment. Although the additional contracts which respondent was able to obtain afforded more work for the step (1) employees at the Rives Company plant than they otherwise would have had, this can hardly be said to have encouraged or discouraged union membership, even if assumed to be discriminatory, for the prior litigation had long since made the employees aware of the effect which their selection of SMW would have on their employer's volume of business.[19] Thus we hold that there was no section 8(a) (3) violation.

The Board found that the Rives Company employees were unfair labor practice strikers since "the strike was called on account of the establishment of the W-M plant, and the assignment of assembly work to the [UA] Pipefitters." Thus the Board held that their discharge violated section 8(a) (3) and ordered reinstatement, backpay, and reimbursement for any loss of wages caused by "transferring assembly work to others."

The testimony in the record of this case clearly shows that the reason for the strike was a fear that all or a

---

17. In some instances the necessary intent or the encouragement or discouragement may be inferred from the nature of the other elements. See generally, Radio Officers' Union v. N. L. R. B., 1954, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455; N. L. R. B. v. Erie Resistor Corp., 1963, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed. 308; N. L. R. B. v. Dalton Brick & Tile Corp., 5 Cir. 1962, 301 F.2d 886; N. L. R. B. v. W. L. Rives Co., 5 Cir. 1961, 288 F.2d 511.

18. This Court in the prior Rives case, supra, 288 F.2d at 515–516, held in the alternative that under the applicable facts there was no discrimination.

19. We do not find it necessary to rely on that provision in SMW's contract which read: "The Union agrees that it will immediately and diligently proceed to do all things necessary to provide for the acceptance of work and products of the Company by any other union or company as the case may be." The prior Rives case, supra, 288 F.2d at 514–515, stated that by this provision SMW "guaranteed acceptance of the work and thereby for itself recognized that if Sheet Metal Workers failed in this undertaking Rives, as the Employer, was free to subcontract out such work in the future *or hire UA workers to perform the work*." (Emphasis added.) This construction was not necessary to the decision in that case, nor was it relied on, since the contract agreement was entered into after the unfair labor practices therein alleged had already taken place. Accordingly, the doctrine of collateral estoppel does not apply. See Restatement, Judgments § 68, comment o (1942). That contract also reserved to the company the right to assign and subcontract the work to be performed by the employees.

large part of the step (2) work would be transferred to the new plant.[20] The strikers accepted UA as the bargaining representative of the W-M employees and did not claim that SMW should represent those workers.[21] Moreover, the unfair labor practice charge filed at the time of the strike did not attack the pre-hire agreement with UA, nor did it claim a section 8(a) (2) violation. The charge alleging the section 8(a) (2) violation was filed December 7, 1960, more than a month after the strike had begun. Since respondent's unfair labor practice

20. Willis H. Wilson, president of the striking SMW local, testified as to the discussion at the meeting when the strike vote was taken and as to the reason for the strike:

"A. They were very concerned about it because there had never been any definite statement given to the union by the company what percentage of work was going to be transferred and how much would be transferred or what particular kind of work would be transferred.
" * * *

"Q. Why did the membership go on strike?

"A. In protest against the company hiring the pipefitters and taking our work that had been ours for years, that we were certified under the National Labor Relations Act to bargain for it.
" * * *

"Q. And did you feel at that meeting that you were going to lose work because of this?

"A. There was talk about it, yes, sir. * * *"

Paul Papevius, Jr., a striker, testified: "I believed that there was an unfair labor [practice] there because they were doing the same type of work to which we were doing and I felt like the time had come when we were to do something about it—the work and the men."

Hilton White, a striker who was on the bargaining committee for SMW, testified as to the meeting:

"A. We—we just discussed pipefitters taking the work over there and that we would like to work an agreement with them on the jurisdiction of work.
" * * *

"Q. What was the concern or the rumors that was going around that you testified to?

"A. That rumor going around, you know, the pipefitters would move a lot of the work and so forth, and something like that * * *. I say that the pipefitters would move in later on and take out all of the work and something like that.
" * * *

"A. It just come down through the grapevine like anyone talking about something like that and you know how people just gets to talking about something just like that and it was going on pretty soon —it was going around that Rives [Company] would get no work—would have no work for the pipefitters."

Edward Pickett, who was on the negotiating committee of SMW, testified:

"Q. And what was the question which was voted upon by the persons present?

"A. Should we strike because the pipefitters was taking our work.
" * * *

"Q. Why [did you go on strike]?" * * *

"A. I didn't feel that the people should be doing our work and we were bargaining agents for our kind of work—type of work."

Fred P. Kupfer, international representative for SMW, testified:

"Q. And that purpose [of the strike] was the work?

"A. It was the jurisdiction of the work by the employees of the sheet metal union.

"Q. In other words, they objected to W-M Corporation people performing work similar to that performed by the W. L. Rives Company?

"A. Basically, yes, sir."

21. Mr. Wilson testified:

"Q. (By Mr. Millar) Now, the main complaint of this meeting, as I understand you, says in fact that the W-M Corporation was going to perform some work which you performed at the Rives Company?

"A. That is very correct. Yes, sir.

"Q. Did the Sheet Metal Workers Union represent the employees at the W-M Corporation?

"A. No, he wouldn't and please let me explain that. It represents the employees. They are represented by the Pipefitters we in no way indicated that we may have done that.

"Q. In other words, it was the work itself?

"A. Yes, sir.

"Q. You don't claim to represent the people?

"A. No. They were already represented by someone else."

(entering into the unlawful prehire agreement) was not a contributing cause of the strike, the striking employees are economic strikers and are not entitled to reinstatement.[22]

The order of the National Labor Relations Board is enforced insofar as it relates to the sections 8(a) (2) and (1) violation arising out of the unlawful recognition of the UA. In all other respects, including reinstatement, enforcement is denied.

---

22. See N. L. R. B. v. Birmingham Publishing Co., 5 Cir. 1958, 262 F.2d 2, 9–10. We do not pass on whether the Rives Company employees would have been unfair labor practice strikers had they struck because of the prehire agreement, which was entered into with respect to a different bargaining unit.