313 F.2d 260
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
FITZGERALD MILLS CORPORATION, Respondent.
TEXTILE WORKERS UNION OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
FITZGERALD MILLS CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 31, 32, 33, Dockets 27422, 27224, 27318.
 United States Court of Appeals Second Circuit.
 Argued Oct. 11, 1962.
Decided Jan. 9, 1963.
 
 Morton Nambow, Atty., N.L.R.B. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., Atty., N.L.R.B., on the brief), for National Labor Relations Board.
 Edward Wynne, New York City (Benjamin Wyle, New York City, on the brief), for Textile Workers Union.
 Theodore R. Iserman, New York City (Kelley Drye Newhall Maginnes & Warren, New York City, and Constangy & Prowell, Atlanta, Ga., on the brief), for Fitzgerald Mills.
 Before CLARK, MOORE and SMITH, Circuit Judges.
 
 
 1
 J. JOSEPH SMITH, Corcuit Judge.
 
 
 2
 No. 27224 is before us on the Union's petition under 10(f) of the National Labor Relations Act, as amended, 29 U.S.C. 160(f), to review and modify certain portions of an N.L.R.B. order of October 11, 1961, 133 N.L.R.B. No. 38, against Fitzgerald Mills Corp. In No. 27422, the Board petitions under 10(e) of the N.L.R.A. 29 U.S.C. 160(e), for enforcement of its order against Fitzgerald, while in No. 27318, Fitzgerald petitions the Court under 10(f), 29 U.S.C. 160 (f), to review and set aside the order. The Board found that Fitzgerald refused to bargain in good faith in violation of N.L.R.A. 8(a)(5) and 8(a)(1), relying primarily on dilatory tactics, intransigence in negotiations, the limitations on authority of Company negotiators, and certain 'unilteral acts'; that it violated 8(a)(1) by making coercive statements and soliciting strikers to abandon the Union; and that it violated 8(a) (3) and 8(a)(1) by denying reinstatement to some unfair labor practice strikers and reinstating others without accrued seniority. Other statements were found to be noncoercive. It therefore ordered the Company to cease and desist from the unfair labor practices found, and ordered reinstatement of the strikers with full seniority and back pay. We find that on consideration of the record as a whole substantial evidence supports the Board's findings. We deny the petitions of Fitagerald and the Union, and order enforcement.
 
 
 3
 The employer, Fitzgerald Mills, is a Georgia corporation operating a cotton mill in Fitzgerald, Georgia. After an election in 1952 certifying Textile Workers Union of America, the union here involved, the Company operated under contracts with it until the events here in suit in 1959. The latest contract was signed March 25, 1957, subject to termination on March 25, 1959, on 60 days notice by either party. On January 20, 1959 the Union gave notice of termination, set forth generally its demands to be incorporated in a new contract in a letter on February 16, and submitted a proposed contract on March 2. The Company submitted its counter-proposal on April 4, and negotiations proceeded sporadically until an impasse was reached on May 7. A strike was voted on May 9, and picketing began May 11. Bargaining continued during the strike under the auspices of a federal mediator, without agreement. The Union ended the strike on July 6, and some of the employees were rehired without seniority. On July 10, the Company announced that any contract must contain provisions that no strikers permanently replaced would have rights under the contract and that those rehired would have no right to their seniority or old jobs. This ended the negotiations.
 
 
 4
 29 U.S.C. 160(b) provides that no complaint shall issue for an unfair labor practice committed six months or more before the signing of the complaint. As the charge here was filed June 29, 1959, nothing prior to December 29, 1958 can be made the basis for an unfair labor practice charge, even if an unfair labor practice itself. But the earlier events may be considered as illuminative of the true character of later events within the limitations period. Local Lodge No. 1424, etc. v. Labor Board, 362 U.S. 411, 416, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). The collective impact of long delay, found in part from evidence outside the sixmonth period, would be a proper basis for a finding by the N.L.R.B. that bargaining was not conducted in good faith. N.L.R.B. v. National Shoes, Inc., 208 F.2d 688 (2 Cir., 1953).
 
 
 5
 To establish dilatory tactics, the Board relies on asserted delays in furnishing wage and job descriptions, information on an employee's insurance policy, and a seniority roster. The Union first demanded wage information and job descriptions, which the Company was required to furnish under the existing contract, on September 23, 1958. The Company agreed to provide this data in a letter of November 11. At a meeting on November 28, the Union also requested 'the social security earnings of the doffer-twisters.' The Union filed an unfair labor practice complaint on December 3, 1958, as a result of the failure of the Company to provide any information to that date. It was withdrawn in February, 1959, the Company having sent a partial job description and wage information list on January 19, 1959. The Union complained of omissions by a letter of February 11. The Company reply on February 20, was that the preparation of job descriptions was time-consuming and that they would be forwarded as completed. But none had been completed in the intervening month, apparently. Nor does it appear that further descriptions have ever been furnished. On February 11, a new demand was made for 'social security earnings of workers.' The Company asked for clarification on February 25, and after the Union reply promptly forwarded complete information, which appeared to fulfill this particular demand.
 
 
 6
 The Company furnished a copy of the insurance policy in question on June 4. The Union claims that it was demanded during the negotiations in April; the Company witnesses testified that the first demand was on June 1. Oddly enough, the President of the Local admitted that he had had a copy all along, while a Company witness testified that they had never furnished anyone with the policy. The discrepancy may have resulted from the apparent fact that the Company unilaterally replaced the policy in effect under the 1955 agreement with a new one in 1957. And the confusion of the witnesses might be explained by assuming that the Union never did get the new policy but did have a copy of the old one. But it seems that the Union would not ask for the new policy until it realized that the old one was no longer in effect. Thus, we may credit the Company witnesses here that no demand was made until relatively late in negotiations. As only a few weeks did elapse during the alleged delay, and the Union contract provided what appears to be a complete schedule of proposed benefits, it is not apparent how negotiations would be impeded by the refusal, if such it was, to furnish a copy of the new policy.
 
 
 7
 In the Union letter of September 23, 1958, a demand pursuant to the contract was made for a seniority roster. The Company replied on November 11 that one had been furnished. The Union admitted that one had been sent, but asserted that it was 'incomplete and unsatisfactory.' However, a different list was posted after the November 28th meeting, and nothing more appears to have been said on the matter. In view of the failure to make a further point of this, we do not find in it a ground to support the finding of dilatory tactics.
 
 
 8
 However, even disregarding the seniority roster and insurance contract delays as evidentiary basis for the subsidiary finding of dilatoriness, the former as unsupported in the facts and the latter as based on a disregard of so much contrary evidence as to be unpersuasive, substantial evidence to support the finding is revealed by the long and unexplained delay to furnish even partial wage and job classification data and the failure to make a complete job classification in all of the months after the demand was made, and even to date. The withdrawal of the unfair labor practice charge does not necessarily indicate compliance or that the Union was satisfied, but only that it felt that the Company had begun to enter into compliance. Moreover, failure to supply requested wage data is a refusal to bargain in violation of 8(a)(5) and (1), standing alone. The Union need not show how the data will be relevant to the bargaining: it is presumably so when negotiations are for higher wages. And even if the Union negotiated a contract without the data, this does not render the information irrelevant. N.L.R.B. v. Yawman & Erbe Mfg. Co., 187 F.2d 947 (2 Cir., 1951). The Union thus had a right to this information under the N.L.R.A. as well as under its contract, and the excessive delay in providing it supports the ultimate conclusion that later bargaining was not conducted in good faith.
 
 
 9
 The finding of Company intransigence is based 'on the nature of Respondent's counterproposal and its adamant refusal to enter a contract with the Union except on its own terms.' At the outset, we wish to make clear that the terms of the Company contract lend no support to this finding in our view. In the realities of the bargaining process, neither party expects its first proposal to be accepted. Since the Company's contract here did provide the basis for future negotiations, it is apparent that the extreme situation illustrated in N.L.R.B. v. Reed & Prince Mfg. Co., 205 F.2d 131 (1 Cir., 1953), cert. denied 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953), is not presented. Indeed, if either contract can be said to have been 'predictably unacceptable' it might well be the Union's which contained some unusual demands: all strikes were considered unauthorized unless expressly ratified by the General President of the Union-- the Union simply agreeing that it would not authorize any strikes; all wage disputes were to be compulsorily submitted to binding arbitration.
 
 
 10
 Consideration of the negotiations themselves, rather than the proposed contracts within whose framework they were conducted, is a better guide to whether there was good faith bargaining. After the Union submitted its proposed contract on March 2, the next meeting was held March 23 at which time the expiring contract was extended one month to April 25. No other action was taken, the Company negotiators stating that they needed more time to study the Union proposals. The Company did agree to submit its own proposed contract by April 6, and this was done on April 4. The only major bargaining meetings held prior to the strike were on April 10 and 24, and taking the testimony of Prowell (a Company negotiator) as credible, only two minor concessions were made by the Company: they conceded that they might allow a provision under 'Grievances' permitting inspection of the plaint by a Union representative and might resolve two pending grievances before the new contract went into effect. The Union made a number of retreats from its original demands, accepting Company proposals or offering to agree to provisions of the expiring contract, which were more favorable than the Company proposals, At the May 7 meeting, no more was said than the Company refusal to compromise its wage and check-off proposals and the Union reply that it would call a strike.
 
 
 11
 After the strike on May 11, a meeting was held on June 1, under the auspices of the Federal Mediation and Conciliation Service. The Company made concessions here concerning arbitration, time limits on grievances, physical fitness, and temporary and permanent jobs, and offered one other concerning workload, to add back a paragraph from the previous contract. The next meeting was July 1, and the parties appeared to be in substantial agreement with the exception of the differing wage proposals and the Company refusal to agree to a checkoff provision. The last meeting was on July 10, after the end of the strike on July 6. At the last meeting, the parties had no further discussion of the contract proposals, as the Company insisted on a provision that protected the jobs of the replacements of the strikers and the Union refused to sign any contract which did not give the strikers back their old jobs.
 
 
 12
 ' The problem is essentially to determine from the record the intention or the state of mind of respondents in the matter of their negotiations with the Union.' N.L.R.B. v. National Shoes, Inc., 208 F.2d 688, 691 (2 Cir., 1953). The failure of negotiations is not of itself determinative, but 'the duty to bargain in good faith is not satisfied by merely meeting with union representatives to inform them that the employer cannot or will not change its position.' N.L.R.B. v. Israel Putnam Mills,197 F.2d 116 (2 Cir., 1952); see also Vanderbilt Prods. v. N.L.R.B., 297 F.2d 833 (2 Cir.,1961); N.L.R.B. v. Century Cement Mfg. Co., 208 F.2d 84 (2 Cir., 1953); Majure v. N.L.R.B., 198 F.2d 735 (5 Cir., 1952). In the case at bar, there was bargaining, narrowly limited by the Company before the strike and somewhat more freely entered into thereafter, but capped by the adamant refusal to consider anything but the Company's harsh position on rehiring of the strikers. The manner of bargaining prior to the strike is not necessarily conclusive of a refusal to bargain in good faith, but the uncompromising attitude it revealed is substantial support for the Board determination that the intention or state of mind of the Company negotiators in meeting with the Union was not one of good faith. The abrupt termination of negotiations when agreement had nearly been reached after the strike had failed also indicates an intent that no agreement be reached and that the Union be forced into a selfdestructive strike.
 
 
 13
 The Board also relies in part on its finding of limited authority of the Company negotiators. The Company's witness Clark (the plant general manager) testified that he was given authority to sign a contract but was required to consult on the check-off and money matters (not specifically wages) and get the approval of the owners in New York. On cross-examination, it was brought out that money matters included more than wages: e.g., vacations, paid holidays, insurance benefits, severance pay. The Company's witness Prowell (one of the attorneys) testified that he had no authority to agree to the check-off or to a wage increase. Constangy (the other Company attorney) testified that he recommended to Botelho (the chief Union negotiator) that he (Botelho) go up and see Horblit (the principal stockholder in Boston) for a discussion on wages. Constangy also considered holidays and vacations to be 'cost items' which had to be referred back to the principals for approval. Barker, a Union international representative, testified that Prowell stated at the meeting at which Constangy was not present that he had no authority to agree to anything. Botelho testified that he did meet with Horblit in Boston on April 20. He also testified that Prowell was unable to make any agreement without Constangy's approval.
 
 
 14
 To sum up, it appears that before the strike on May 11, there were meetings at the following dates: March 23 (at which time the Company did not discuss proposals but requested more time to study them); April 10; April 24 (at which Constangy was not present and no agreement was possible); May 7 (lasting only a few minutes, at which the Company stated that it would adhere to its original proposals and the Union replied that it would strike). Although ther was a little confusion on this, the conclusion is that there was only one meeting at which agreements could be reached. Delays in referring proposals to the principals in New York and Boston were inevitable. It is true that prior contracts had been negotiated on this kind of basis. But it can at least be said that the inherent possibilities of delay did not contribute to ease inreaching an agreement.
 
 
 15
 If in other respects good faith is found it is not enough to establish an unfair labor practice solely that the representative of the Company was not empowered to enter into a binding agreement. Lloyd A. Fry Roofing Co. v. N.L.R.B., 216 F.2d 273 (9 Cir., 1954), modified 220 F.2d 432 (9 Cir., 1955). It is, however, proper to take the powers of the actual negotiators into account, id. at 275; Great Southern Trucking Co. v. N.L.R.B., 127 F.2d 180, 185 (4 Cir., 1942), cert. denied 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 524 (1942). That they were not authorized to enter into an agreement is an obstacle to the bargaining process which lends weight to the Board's conclusion that the Company intended that no agreement be reached.
 
 
 16
 The Board relied in part also on unilateral acts by the Company. The wages and duties of the forklift driver had been changed during 60 days prior to April 10, when the Union was first informed of the change. This is uncontested from the record. This in itself is not 'substantial'. It is at most a violation of the 1957 contract then in force in that the Company failed to give notice of the change in advance of making it. The Company contends in its Brief that this change was a prerogative reserved by it under the Management Clause. Without attempting to resolve this contractual problem, even assuming that it is a violation, it adds so little that it must be dismissed as insignificant, and no weight given in the ultimate determination whether the Company did not bargain in good faith.
 
 
 17
 The wage increase is by far the most important 'unilateral act'. At the meeting of May 7, Constangy testified that he told Botelho that the Company would not retreat from its positions on wages and check-off. Botelho replied that he would 'recommend' a strike. Constangy answered that the wage increase would be put in effect the following Monday, May 11. Others present at the meeting corroborate this. it is uncontested that a strike meeting was called on May 9, and a strike was voted which began May 11. The wage increase apparently went into effect May 11-- although the Company notice to this effect stated that it would go into effect immediately and it was dated May 7. Isolated wage increases for a few employees during negotiations cannot be characterized as unfair labor practice probative of bad faith. White v. N.L.R.B., 255 F.2d 564 (5 Cir., 1958); N.L.R.B. v. Superior Fireproof Door & Sash Co., 289 F.2d 713 (2 Cir., 1961). But where unilateral wage increases have been made while they were the subject of bargaining, this combined with unilateral changes in workloads has been found enough to support a finding of bad faith bargaining. N.L.R.B. v. Bonham Cottom Mills, Inc., 289 F.2d 903 (5 Cir., 1961). And a wage increase given after a strike has been called and been unsuccessful, has been held to be evidence probative of prior bad faith in negotiations. Majure v. N.L.R.B., 198 F.2d 735 (5 Cir., 1952). The announcement of the increase contemporaneously with the strike decision could well be found a deliberate attempt by the Company to deal individually with the employees, and convince them that all benefits would come from the Company's sole choice, thereby weakening the Union in its strike effort. This timing is particularly convincing support for the conclusion that prior negotiations were not conducted in good faith.
 
 
 18
 The Board relies also on notices posted by the Company on April 6, 13, and 24. Of these, only the two notices posted April 24 appear material. The parties had agreed that a notice should be posted and one was agreed on and mailed from Atlanta to Fitzgerald where it was posted April 27. In the meantime, however, a notice in terms placing on the Union the onus of delay in making effective the proposed wage increase was telephoned by Company representatives to the plant and posted by 2 o'clock on the 24th. This calculated attempt to undermine union prestige at the plant is further evidence of refusal to bargain in good faith. N.L.R.B. v. Century Cement Mfg. Co., 208 F.2d 84, 86 (2 Cir., 1953); N.L.R.B. v. Winona Textile Mills, Inc., 160 F.2d 201 (8 Cir., 1947).
 
 
 19
 The Board overruling the Trial Examiner, found that General Manager Clark had attacked the Union during the strike in coercive statements to employees. The Union presented much evidence that on May 22 Clark stated to strikers in effect: 'Get those union agitating sons of bitches out of Fitzgerald' and that he would 'die and go to hell before he would sign a contract.' The examiner thought Clark's denials of such statements more consistent with the progress of negotiations before and after May 22. It is within the power of the Board to overrule the hearing examiner where credibility is involved 'if his findings conflict with strong inferences from evidence which he credited.' Utica Observer-Dispatch, Inc. v. N.L.R.B., 229 F.2d 575, 577 (2 Cir., 1956); see also N.L.R.B. v. Pyne Molding Corp., 226 F.2d 818 (2 Cir., 1955). The Board is justified by the whole record here in drawing such inferences.
 
 
 20
 The evidence of the unilateral wage increase, the notices, the limited authority and the uncompromising bargaining attitude, in the light of the earlier failure to furnish information meet the requirement of substantial evidence on the record as a whole, Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), to sustain the Board's finding of refusal to bargain in good faith. Indeed there was additional evidence, on which the Board apparently did not rely, in Constangy's admitted statement encouraging the Union to strike, which clearly demonstrated the intent of the chief Company negotiator to reach no agreement.
 
 
 21
 Turning to the Board's conclusion that the strike was an unfair labor practice strike rather than an economic strike, we find the Board's finding supported, first by Botelho's protest to Horblit on April 20 that 'the local management was not entering good faith bargaining with the union'; second by the Union telegram to Horblit May 7 in effect that the Company position, adhering to its original proposals compelled Botelho to recommend a strike; third, Botelho's statements to the Union meeting May 9 that the Company was out to destroy the Union, that the history of the negotiations showed that the Union had been unable to abrgain with the Company, and that the Company was not bargaining in good faith; fourth, the Union letter of May 12 to the strikers mentioning bad faith bargaining; and fifth, the Union strike notice mailed May 7 to call the meeting May 9, characterizing the Company proposal as 'sub standard' and an 'insult'. These are substantial evidence to support the Board's finding. A strike may be an unfair practice strike even though it also has economic objectives. N.L.R.B. v. A. Sartorius & Co., 140 F.2d 203 (2 Cir., 1944); N.L.R.B. v. Stackpole Carbon Co., 105 F.2d 167 (3 Cir., 1939), cert. denied 308 U.S. 605, 60 S.Ct. 142, 84 L.Ed. 506 (1939); Butcher Boy Refrigerator Door Co. v. N.L.R.B., 290 F.2d 22 (7 Cir., 1961). Unfair labor practice strikers must be rehired on demand, N.L.R.B. v. Sunrise Lumber & Trim Co., 241 F.2d 620 (2 Cir., 1957), cert. denied 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34 (1957); Mastro Plastics Corp. v. N.L.R.B.,350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956), and are entitled to receive reinstatement and back pay if they are not. Such an unconditional demand for reinstatement was made at least by July 15 and possibly earlier. They are entitled to reinstatement with back pay even though there were also other causes of the strike. N.L.R.B. v. Remington Rand Inc., 94 F.2d 862 (2 Cir., 1938), cert. denied 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540 (1938). Since there was substantial evidence to support the Board's finding that refusal to bargain in good faith was at least one cause of the strike, the portion of the order requiring reinstatement and back pay must be enforced.
 
 
 22
 The finding of violations of 8(a)(1) is supported by statements by General Manager Clark, discussed above, and by statements by Foreman McDowell to employee Woodward on two occasions: '* * * if we wanted to keep our jobs we better just leave the union alone' prior to the strike, and 'that if I had not walked out I would have a regular job on the first or second shift one' * * * 'he said, 'I could have told you that after you became a member of the union, in fact, I tried to" in November after the strike. That these statements, in the light of the circumstances surrounding their making were coercive is surely a permissible finding, and hence must be held outside the free-speech protection of 8(c) of the Act. The Union contends that additional statements of Clark to employees Clemons and Peacock should also have been found violations. In their settings, these remarks, although derogatory of the Union, were properly held not coercive, and we uphold the Board's finding. N.L.R.B. v. Sandy Hill Iron & Brass Works, 165 F.2d 660 (2 Cir., 1947).
 
 
 23
 Moreover, it is difficult to see what would be gained for any purpose by amending the Board's order in this regard, for the order is quite broad in prohibiting interference with, restraint or coercion of the employees in their union activities.
 
 
 24
 The petitions of the Employer and the Union are denied. Enforcement of the Board's order in full is ordered.
 
 
 25
 LEONARD P. MOORE, Circuit Judge (dissenting).
 
 
 26
 In my opinion, the factual and legal conclusions of the Trial Examiner were clearly supported by substantial evidence. During the hearings which continued for some days, he had an opportunity unavailable to the Board or to this Court properly to appraise the demeanor and credibility of the witnesses. The inferences which he drew should be entitled to more weight than inferences made by others not present. The National Labor Relations Act was designed to promote good will and harmony between employer, employee and union. Here Company and Union had shown themselves capable of successful and peaceful labor negotiations for some twelve years. This is not the kind of background against which to make a finding of bad faith based largely on inference just because the negotiations in 1958-59 turned out to be more protracted than prior negotiations.
 
 
 27
 I. GOOD FAITH BARGAINING.
 
 
 28
 The statutory requirement that both parties to a collective bargaining contract meet and 'bargain in good faith' has given the Board and the courts considerable difficulty. The appropriate standard, 'a desire not to reach an agreement with the union', is necessarily highly subjective. N.L.R.B. v. Reed & Prince Mfg. Co., 205 F.2d 131, 134 (1st Civ., 1953), Civ., 1953), cert. denied 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). The statute was not intended to require agreement by the parties or to permit the Board or the courts to impose on the parties their concept of an appropriate agreement under the circumstances. N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 402, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). What is required is that the parties meet to disclose their proposals, that such proposals be the subject of discussion so that each party be aware of the other's views and so that compromise between them be made more likely, and that neither party place insurmountable obstacles in the path of agreeable reconciliation of opposing demands. The record clearly supports the conclusion that at all times the Company was prepared to come to an agreement with this Union albeit on terms that the Union may have found unsatisfactory. In this regard the Trial Examiner found:
 
 
 29
 'In my opinion the record supports a finding herein that both parties in their negotiations prior to the strike on May 9, 1959, met at reasonable times and conferred in good faith with respect to terms and conditions of employment with the expectation of reaching agreement and executing a written contract incorporating any agreement reached.'
 
 
 30
 The Board justified its conclusion that the Company refused to bargain in good faith by inferring a Company state of mind from several occurrences, namely that: (1) the Company engaged in dilatory tactics by its delayed and in some instances complete failure to supply requested information concerning wage rates, job descriptions, seniority rosters and insurance benefits; (2) the submission of a 'predictably unacceptable' counterproposal and an uncompromising attitude during the course of negotiations; (3) the limited authority of the Company's negotiators at the bargaining table; (4) unilateral changes in the wages and work loads of the forklift driver and the loomfixers; (5) notices during the course of negotiations by the Company informing the employees of proposed wage increases not accepted by the Union; (6) certain remarks of General Manager Clark; (7) the Company's proposal after the strike had been initiated that the Union waive any right to reinstatement of the strikers. The majority has rejected certain of these subsidiary findings as either unsupported by substantial evidence or of such minimal effect that they cannot be deemed of any significance in determining the Company's attitude toward negotiations.
 
 
 31
 (a) Dilatory tactics. The Board found that the Company displayed a reluctance to provide information requested by the Union on September 23, 1958. The majority properly rejects this finding as unsupported in the record with respect to the requests for seniority rosters or insurance benefits. However, the majority does find substantial support for a finding of dilatory tactics by virtue of the delay in providing wage data and the failure to make a complete job classification analysis as requested.
 
 
 32
 A letter from the Union on September 23, 1958 requested, inter alia, 'wage rate information'. On November 11, 1958, the Company agreed to supply this and it was given to the Union on January 19, 1959. The Union found this information to be incomplete with respect to incentive rates, requesting on February 11, 1958 that instead of the wage scale for incentive workers according to percentage efficiency already provided, that the Union be supplied with the average earnings of incentive workes for the last two Social Security quarters of the preceding year. The Company again agreed to supply this data on February 20, 1958 and following correspondence clarifying the request, it was submitted to the Union on March 6, 1959. The majority characterizes the delay in providing this information as excessive. I cannot agree. Although the wage information delivered to the Union on January 19, 1959 might have been forthcoming at an earlier date, it is significant that the letter supplying that information included a partial job classification analysis that had taken some time to prepare. In addition, the period of time after January 19, 1959 was the result of the Union's request for wage information in a form not before demanded, and this additional request was complied with almost immediately.
 
 
 33
 With respect to the job classification data, admittedly a complete listing was never furnished to the Union, It is uncertain whether this by itself would constitute an unfair labor practice in the case where such job descriptions had never before been compiled, compare N.L.R.B. v. United Brass Works, Inc., 287 F.2d 689, 697 (4th Cir., 1961) and Exchange Parts Co. v. International Bh. of Boilermakers (Exchange Parts Co.), 139 NLRB No. 46 (Oct. 31, 1962), with United Steelworkers Union (Hanson Mfg.), 137 NLRB No. 38 (May 24, 1962).
 
 
 34
 (b) The submission of a 'predictably unacceptable' counterproposal and an uncompromising attitude during the course of negotiations. The majority opinion rejects this characterization of the Company's counterproposal and instead finds that 'if either contract can be said to have been 'predictably unacceptable' it might well be the Union's'. Nevertheless, it then proceeds to analyze the negotiations, finding an 'uncompromising attitude' on the part of the Company. Implicit in the finding of the Board and the majority is a determination on their parts that the Company was acting improperly in adhering to its original proposal. The course of negotiations demonstrates a greater willingness on the part of the Union than the Company to recede from its original position. This, however, would naturally follow from the fact that it was the Union's original proposal that was such a radical departure from the prior collective bargaining contract. Furthermore, it is not the function of the National Labor Relations Board or the Federal courts to determine the proper resolution of differences arising during the course of negotiations. The Prince standard of 'a desire not to reach agreement with the union' does not require a Company to enter into negotiations with a completely open mind concerning the subjects to be discussed. By necessity, a Company may begin negotiations with certain firmly felt convictions on the matters subject to negotiation, and as to matters properly the subject of bargaining 'neither party is legally obligated to yield.' (N.L.R.B. v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958)). The Supreme Court has said:
 
 
 35
 'Thus it is now apparent from the statute itself that the Act does not encourage a party to engage in fruitless marathon discussions at the expense of frank statement and support of his position.'
 
 
 36
 N.L.R.B. v. American National Insurance Co., supra, 343 U.S. at 404, 72 S.Ct. at 829. The Trial Examiner's finding that the parties met at reasonable times with the expectation of reaching agreement is fully supported in the record, and there is no substantial evidence in the record to support a contrary finding.
 
 
 37
 (c) The limited authority of the Company's negotiators. Although the lack of authority given negotiators is not a per se violation of Section 8(a)(5), it is a factor to be considered in the light of all the other circumstances. The negotiators here were limited in their power to come to an agreement with respect to wages and the check-off proposals. However, they were authorized to negotiate certain other provisions in dispute and did compromise some of these issues at a bargaining conference on June 1, 1959. This is not the kind of case in which the negotiators were without any authority to vary the Company's proposals, and those with sufficient authority were out of reach. On the contrary, the Company's negotiators were in constant touch with the Company's president, Horblit, apparently calling him after every bargaining session. See McLeanArkansas Lumber Co., 109 N.L.R.B. 1022, 1038 (1954). In addition, at the suggestion of Constangy, one of the Company's negotiators, bothelo, the Union's representative, traveled from georgia to Boston to meet with Mr. Horblit. As the Court of Appeals for the Ninth Circuit has said in holding that lack of authority is not a per se violation of 8(a)(5):
 
 
 38
 'Union representatives were at liberty to discuss with Bahrs any and all proposals and counterproposals and thus secure clarification of the issues, an important element in reaching agreement. Bahrs could, and did, make recommendations to the Company, and thereby conveyed to it an appraisal of the situation and the Union's demands.'
 
 
 39
 Lloyd A, Fry Roofing Co. v. N.L.R.B., 216 F.2d 273, 276 (9th Cir., 1954), modified 220 F.2d 432 (9th Cir., 1955).
 
 
 40
 (d) Unilateral acts in changing wages and work loads of the fork lift driver and loomfixers. The majority characterizes this element of the Board's case as insubstantial and insignificant, and to be given no weight in the ultimate determination. At most it raises a question of interpretation of the then existing collective bargaining agreement.
 
 
 41
 (e) Unilateral wage increase. The majority places granted to the unilateral wage increase granted to the workers, effective on either May 7th or 11th, after the parties had reached an impasse in negotiations and after the Union had informed the Company that it intended to strike. Recently the Supreme Court in N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) held that a unilateral wage increase granted to workers during the course of negotiations but before the existence of an impasse and without consultation with the Union constituted a violation of the Company's duty to bargain in good faith, even in the absence of a Board finding of overall bad faith in the conduct of the negotiations. The Court there stated in a footnote:
 
 
 42
 'Of course, there is no resemblance between this situation and one wherein an employer, after notice and consultation, 'unilaterally' institutes a wage increase identical with one which the union has rejected as too low.' See National Labor Relation Board v. Bradley Washfountain Co., 7 Cir., 192 F.2d 144, 150-152; Labor Board v. Landis Tool Co., 3 Cir., 193 F.2d 279.
 
 
 43
 N.L.R.B. v. Katz, supra, at p. 745, n. 12, 82 S.Ct. at p. 1113. That is exactly the case here. The wage increase granted was the same 10% Increase offered to the Union in the course of negotiations and the Union was notified of the Company's intention to put it into effect immediately. The footnote and the cases apparently cited with approval therein make clear that there is to be no inference from the Company's unilateral wage increase here. As the Supreme Court on another occasion has stated:
 
 
 44
 'We do not here have a unilateral grant of an increase in pay made by an employer after the same proposal has been made by the employer in the course of collective bargaining but has been left unaccepted or even rejected in those negotiations. Such a grant might well carry no disparagement of the collective bargaining proceedings. Instead of being regarded as an unfair labor practice, prejudice to the rest of the negotiations.' representative, without prejudice to the rest of the negotiation.' N.L.R.B. v. Crompton-Highland Mills, Inc., 337 U.S. 217, 224, 69 S.Ct. 960, 93 L.Ed. 1320 (1949).
 
 
 45
 Nor are the cases cited by the majority apposite. In N.L.R.B. v. Bonham Cotton Mills, Inc., 289 F.2d 903 (5th Cir., 1961), the wage increase was granted without prior notification of the Union. Majure v. N.L.R.B., 198 F.2d 735 (5th Cir., 1952) is even further off point. There the present rate of commissions, a subject to bargaining, was 18%. The Company had proposed that the rate remain the same; the Union was requesting a 25% Rate. During negotiations the Union had indicated its willingness to compromise at a 20% Figure, but this was rejected by the Company. However, after the negotiations had broken down, the Company unilaterally instituted an increase to the 20% Figure already rejected by the Company during the prior bargaining sessions.
 
 
 46
 (f) Remarks of General Manager Clark. The Board relied on remarks made by the General Manager on several occasions to striking employees outside the plant and to non-striking employees within the plant. On May 22, 1959, Clark drove to the plant in his automobile and stopped in front of the gate near his office to engage in conversation with several strikers. The Trial. Examiner credited Clark's version because it was more consistent with the past and subsequent negotiations between the parties. The Board rejected the Examiner's finding in this regard, solely on the ground that if he were incorrect in his characterization of the bargaining, the underlying basis for his credibility finding, then his ultimate conclusion as to credibility must fall but the Examiner's finding was also based in part on the past history, running back some twelve years, of successful and peaceful negotiations between the Company and the Union.
 
 
 47
 The Board also relied on statements made by Clark to non-striking employees in the plant which the Board concluded revealed that the Company was not meeting with the Union with an open mind and an intention to reach agreement. The only remarks that might be so construed were made on May 25, 1959 to a non-striking employee that 'he would not sign a contract with the Union unless they came to his agreements.' This was an isolated remark, made after months of unsuccessful negotiations at a time when the positions of both the Company and the Union had become firmly established.
 
 
 48
 (g) The Company's proposal made after the strike had been initiated that the Union waive any right to reinstatement of the strikers. The Board's use of this demand is predicated on its view that the strike was an unfair labor practice strike and that the Company was in effect asking the Union to agree to the waiver of absolute rights to reinstatement on the part of the striking employees. However, if in fact this was an economic strike, then there was nothing improper about the Company's proposal since most of the strikers had been replaced by other workers.
 
 
 49
 In my opinion, there is not sufficient evidence of bad faith in this case. As a minimum, however, this case calls for a remand to the Board for a redetermination of their finding in the light of the majority's rejection of some of the grounds on which the Board's conclusion was based, especially the majority's heavy reliance on the unilateral wage increase, a ground I would hold to be clearly error as a matter of law. See Bon-R Reproductions, Inc., v. N.L.R.B., 309 F.2d 898 (2d Cir. 1962) (Friendly, J., concurring and dissenting).
 
 
 50
 II. REINSTATEMENT.
 
 
 51
 The Trial Examiner, after finding that the Company had bargained in good faith, held that the strike was an economic one and that therefore the strikers were not entitled to reinstatement to jobs that had been filled while they were on strike. The Board reversed this finding and held that the strike was at least in part a result of the Company's refusal to bargain in good faith, and thus an unfair labor practice strike entitling the strikers to reinstatement and back pay. N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). The majority agrees with the Board, more fully buttressing the Board's conclusion that the strike was motivated by the Company's refusal to bargain in good faith. Since I am of the opinion that the Company in fact did bargain in good faith, I would hold the strike to be economic in nature and the strikers not entitled to reinstatement. N.L.R.B. v. W.L. Rives Co., 288 F.2d 511 (5th Cir., 1961); N.L.R.B. v. James Thompson & Co., 208 F.2d 743, 749 (2d Cir., 1953); N.L.R.B. v. Scott & Scott, 245 F.2d 926 (9th Cir., 1957); Winter Gardens Citrus Products Cooperative v. N.L.R.B., 238 F.2d 128 (5th Cir., 1956); N.L.R.B. v. Brashear Freight Line, Inc., 119 F.2d 379 (8th Cir., 1941).
 
 
 52
 III. COERCIVE STATEMENTS.
 
 
 53
 I concur with the majority's determination that the remarks of General Manager Clark to employees Peacock and Clemons were not coercive. The majority, however, accepts the Board's finding that the statements of Foreman McDowell were in violation of 8(a)(1). The Board's finding was predicated on its conclusion that 'In view of the Respondent's other violations, as set forth herein, these statements were neither isolated nor minor.' As I would agree with the Trial Examiner that there were no other violations, I would reinstate his finding that these statements were trivial and insignificant.
 
 
 54
 I would deny enforcement and set aside the Board's order.