NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

AMERICAN AGGREGATE COMPANY,
Inc., and Featherlite Corpora-
tion, Respondents.

No. 19109.

United States Court of Appeals
Fifth Circuit.

June 28, 1962.

**560**

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Stuart Rothman, Gen. Counsel, Allison W. Brown, Jr., Russell Specter, Attys., N. L. R. B., Washington, D. C., for petitioner.

John Edward Price, Fort Worth, Tex., for respondents.

Before BROWN and WISDOM, Circuit Judges, and DeVANE, District Judge.

### JOHN R. BROWN, Circuit Judge.

The question before us is whether substantial evidence supports the Board's finding of violations of § 8(a) (1), (3), and (5).[1] In addition to the usual denial and attack on the sufficiency of the evidence, the Company raises the defense of the 6 months' limitation as set out in § 10(b).[2] On the record before us, there is little room for disagreement with the

Board's finding, and we therefore enforce the Order in all parts except that relating to one employee under the § 8(a) (3) charge.[3]

Just a short time ago this same Employer was found by the Board and this Court to have violated § 8(a) (1) and (5). N. L. R. B. v. American Aggregate Co., 5 Cir., 1960, 285 F.2d 529. The Order enforced in that case, covering the period up to April 27, 1959, was based in large part upon the Company's refusal to bargain in good faith. Nothing has been brought to our attention to indicate that the Company has even slightly changed its position or practices since that time. Indeed, try as it may, the Union[4] has not been able to have even a meeting with the Company for the purpose of bargaining. All such requests have either been ignored or refused.

Finally on July 29, 1959, of the Company's 44 regular employees, 30 went on strike in protest against the Company's unwillingness to meet with their bargaining representatives. While the strike was in progress and several times since, the Union renewed its requests to meet and negotiate, but the Company has continued its refusal.

The strike ended on September 15, 1959, when all the striking employees made unconditional requests for reinstatement. But some of the returning employees found that the Company[5] had modified its method of operation since the strike began. For the most part the changed operations were brought about by economic conditions and breakdown of machinery. This aspect of the case will be discussed later as it relates to the § 8(a) (3) violation.

The § 8(a) (5) violation is overwhelmingly supported by substantial evi-

1. 29 U.S.C.A. § 158(a) (1), (3), and (5).

2. 29 U.S.C.A. § 160(b).

3. The Board's finding of a § 8(a) (3) violation involved three employees. Substantial evidence supports the findings and Order of reinstatement as to two of them, but not the third.

4. United Stone and Allied Products Workers of America, AFL-CIO.

5. The Company's plant is located at Ranger, Texas. It is engaged in the excavating and processing of clay and related products.

dence. Indeed, a more flagrant case would be difficult to imagine. The Company has not even gone through the motions of bargaining. See N. L. R. B. v. Herman Sausage Co., 5 Cir., 1960, 275 F.2d 229. Since April 27, 1959, the Company has not had a single meeting with the Union, though repeated requests have been made.

The Company has never at any time spelled out the position that it had no duty to bargain with the authorized representatives of the employees. It has chosen instead the bolder and more risky course of refusing to bargain presumably on the ground that the Union did not represent a majority of the employees. See N. L. R. B. v. Dan River Mills, Inc., 5 Cir., 1960, 274 F.2d 381, 386. Curiously enough, that attack on the Board's Order is not urged here, nor would the record before us support such a position. It is without dispute that the Board conducted an election in 1957 and certified the Union as the bargaining representative. In such a situation, and without a single stitch of evidence indicating a change in the situation, the Union's majority status is presumed to continue. And certainly the Employer may not with impunity stop all negotiations with a union that has been certified as the bargaining representative merely because some doubt as to majority status has arisen. See Brooks v. N. L. R. B., 1954, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125; N. L. R. B. v. Sanson Hosiery Mills, 5 Cir., 1952, 195 F.2d 350; N. L. R. B. v. Taormina, 5 Cir., 1953, 207 F.2d 251; N. L. R. B. v. White Construction & Engineering Co., 5 Cir., 1953, 204 F.2d 950; Parks v. Atlanta Printing Pressmen & Assistant's Union, 5 Cir., 1957, 243 F.2d 284; 5 Cir., 248 F.2d 386.

If the Company had good faith doubts about the majority status of the Union, it has made no effort to show any basis for them in this record. Since the evidence is not challenged in any acceptable way, we have no reason either to doubt or examine the Board's finding both in the present and in the prior proceeding that the Union was supported by a majority of the employees in the bargaining unit.[6] There was no evidence of any dissatisfaction by the employees with the Union. And the pudding's proof being in its eating, the Company was well aware that 30 of the 44 employees in the unit actively supported and participated in the strike. And if that was not enough, the Union offered to prove its majority status in several ways. But consistent, and hardheaded to the bitter end, the Company stoutly maintained its position that it did not intend to recognize the Union by any means short of a full scale Board election.

As stated previously, the Company has not challenged the Union's majority status in this Court. It has chosen to defend its § 8(a) (5) violation by use of the § 10(b) limitation period of six months. But this borders on the frivolous.

The Charge was filed March 9, 1960. The 6 months' cutoff date was September 9, 1959. The Charge, in paragraph 10, specified several actions subsequent to September 9, 1959, constituting a refusal to bargain in good faith. Specification No. 4 referred to the unilateral institution of a profit-sharing-incentive plan on January 7, 1960. And No. 3, in what turned out to be an understatement, specified:

"The refusal to meet and bargain with the Union on and after April 24, 1959."

Within the 6 months' period over a dozen formal requests for a conference were made by the Union. Some of the requests were directed to the President of the Company, but most of them were directed to the Company's attorney, previously designated as its authorized bargaining representative. But all such requests met with no success. They were

---

6. No specification of error remotely touches the question of majority status. Attack on the § 8(a) (5) order is confined to the 6 months' limitations period of § 10 (b). See Point IV, Respondents' brief.

either dodged, ignored or refused. But most of them were simply ignored. This was not the case of the busy attorney finding it difficult to arrange his schedule to fit in the tedious and often drawn out bargaining process. Nor was it the case of a mere personal thoughtlessness or what might be deemed a discourtesy. For reasons which he thought sufficient the Company lawyer by purposeful design ignored altogether the letters of December 24, 1959, January 28, 1960, and February 5, 1960 from the Union requesting information and bargaining conferences. To completely ignore requests to meet for bargaining is refusal in its rankest and rawest form.

As though this was not enough, a representative of the Union, along with several employees, after first giving precise written prior notice to the Company, went to the office of the General Manager of the Company on February 11, 1960. Not only did the Company decline to meet, much less bargain, they were in effect refused admittance. Not 6 months before, this was scarcely one month prior to the charge. More than that, the formal note handed them makes a mockery out of the contention now advanced that all of this was too stale. Signed by the General Manager, it read:

"I do not recognize your union as representing the majority of our employees; therefore, I have nothing whatsoever to discuss with you."

Later that same day, the Union representative, again turning the other cheek, sent a letter to the Company's bargaining representative saying that if the Company wished "to negotiate any changes," he would "volunteer to meet * * * for that purpose." Needless to say, that letter was also ignored.

If—and there is no if, either big or little—the foregoing were not enough to sustain the finding of a § 8(a) (5) violation—the Board has found, with like abundant support in the evidence, that the Company unilaterally instituted a profit-sharing-incentive plan on or about January 2, 1960. No notice was given to the Union. If the unlawfulness of such action by an employer was ever in doubt, the Supreme Court has recently made that very plain. Concerning this the Court stated, "the Board may hold such unilateral action to be an unfair labor practice in violation of § 8(a) (5), without also finding the employer guilty of over-all subjective bad faith," because it amounts "to a refusal to negotiate * * * and must of necessity obstruct bargaining, contrary to the congressional policy." N. L. R. B. v. Katz, 1962, 82 S. Ct. 1107.

With the unilateral institution of the profit-sharing-incentive plan, the absolute refusal to see or meet with the Union's representatives or respond to repeated, precise, courteous requests for bargaining—all well within the six months preceding the filing of the charge—the Company's defense on this score is simply unfathomable.

The asserted § 8(a) (3) [7] violation arose out of the alleged failure of the Company to reinstate the returning strikers to their former or substantially equivalent jobs.[8]

It is well established that when a strike is brought about by unfair labor practices of an employer, the returning strikers are entitled to be reinstated to their former or substantially equivalent employment upon their unconditional request. Mastro Plastics Corp. v. N. L. R. B., 1956, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309. The Company does not dispute this. The Company does urge, however, that there is not substantial evidence to support the finding of an unfair

7. A § 8(a) (1) violation was found along with both the § 8(a) (3) and (5) violations. This, too, we find is supported by substantial evidence, and therefore is enforced.

8. The charge and complaint listed eight discriminatees, but the Board found that only three of them had been discriminated against. Only those three, D. D. Foster, Archie Hatton, and Louie Nowak, are involved here.

labor practice strike. But to succeed on this ground, the Company once again falls back on the § 10(b) limitation to exclude all evidence of events occurring prior to the six months' period. As the strike began prior to this six months' period, so the argument goes, evidence of occurrences that led up to and caused the strike or which contributed to its continuation is necessarily barred by § 10(b). On the most cursory analysis, this position is untenable.

In a § 8(a) (3) striker reinstatement case the significant thing is not when the strike started, or how long it has gone on. What is important is the status of the returning striker. This is because an employer's responsibility of reinstatement is quite different for those who struck to gain economic bargaining power than it is for those who struck as a protest against an employer's unfair labor practices. Determination of the employees' status must therefore necessarily depend on the causes of the strike. It is inescapable that such evidence will have to go back to the beginning, or at least to the time the character of the strike changed.[9] But § 10(b) does not bar evidence. It bars charges. The charge under review was not the Company's actions giving the strike its unfair labor practice character. It was that, within the 6 months' period, the Company refused to reinstate an employee then having a significant status entitling him to different treatment.

The Company's second line of defense as to the § 8(a) (3) charge is that it had changed its operations substantially during the strike because of economic reasons.

As to D. D. Foster and Archie Hatton, extended discussion is unnecessary. They were reinstated to duties somewhat different than their pre-strike employment, and were put on a shorter work week with a consequent drop in pay. It was found and not disputed that the changed operations had not affected their jobs. In other words, they could have been reinstated to their former employment. The Company's defense is the failure of the Board to establish a discriminatory intent, by showing that the General Manager of the Company readily admitted that their reassignment was a mistake. But whether it was a mistake or was rather a purpose to show displeasure for their having gone on strike was a fact decision for the Board. Specific evidence of intent is not required when, as here, such intent may be reasonably inferred. See Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N. L. R. B., 1961, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11; Radio Officers Union of Commercial Telegraphers Union, A.F.L. v. N. L. R. B., 1954, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed.2d 455. The Board's Order as to Foster and Hatton is therefore enforced.

But the case of Louie Nowak is on an entirely different footing. It was established that the Company had actually changed its methods of operation during the strike, and that this change was motivated by economic factors and machinery breakdown. The net result was that upon Nowak's return, his same job was no longer available.

The Company manufactures a light weight shale by heating and expanding it in a rotary kiln which operates continuously around the clock. The kilns discharge the heated material into cooling pits from where it is lifted onto a stock pile by a drag-line machine known as a "clam." Bulldozers move material in the stock pile to other locations for further processing.

Prior to the strike, two "clam" machines were used in the clamming operation, one being operated by Nowak and the other by Ray Nicks. These two worked the same shift from 8:00 in the morning until 4:00 in the afternoon, known as the day shift. No clamming was performed during the evening (4

9. See, e. g., N. L. R. B. v. J. H. Rutter-Rex Manufacturing Co., 5 Cir., 1957, 245 F.2d 594, 596.

P.M. to 12) or midnight (12 to 8 A.M.) shifts. Both of the operators "pushed-up" with a bulldozer on brief and infrequent occasions. But most of the bulldozing was done by another employee who worked the midnight shift.

During the strike, a number of changes were made. The most important change affecting Nowak (or "his" job) was that one of the "clam" machines broke down, and it was taken out of use. It is uncontradicted that that machine needed extensive repairs, and that the Company deliberately decided not to repair or replace it. This necessitated a change in shifts in order to keep the one remaining "clam" machine in operation around the clock. So Nicks took the day shift, and a new man, Stagner, took the evening shift. Supervisors operated the "clam" on the midnight shift. The full time bulldozer operator was no longer needed because, as the trial examiner found, "the three clam operators on each shift could then do both the digging and the bulldozing."

At this point the strike ended and Nowak, along with the others, applied for reinstatement. When Nowak came to the office, the following conversation took place between Carl Black, the General Manager, and Nowak.

Black: "Now, Louie, we are doing some revamping actually. Of course, we had you operating a clam which I want you to do just like you were doing before except we are going to —we have had some changes as far as the way that we are going to bale out. We were having some static especially with these machines like they are being able to get everything done we want to get done during the day, so we are going to have a clam operator around the clock. * * * So that's the way we are going to operate that, and if you are ready to go back to work I can put you on. * * * When do you think you are going to come out?"

Nowak: "Well, let's make it tomorrow. * * * What are we working, I mean, when I come out?"

*  *  *  *

Black: " * * * so we will be looking for you tomorrow night at 12:00."

Nowak: "Okey dokey."

But Nowak did not show up the next night or any other night.

Taking the record as a whole, and giving full effect to the recent admonitions on the function of the reviewing court, N. L. R. B. v. Walton Manufacturing Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed. 2d 829, the evidence simply fails to support the finding that Nowak was not offered substantially equivalent employment.[10] It was undisputed that the physical operations had changed. It was also undisputed that purely economic and mechanical reasons, wholly unrelated to the strike or labor strife generally, had necessitated the change. Nowak's former job—working the day shift together with another employee—was no longer available. The day shift was filled by a worker whom the law did not require the Company to discharge to make way for the returning striker. That left the evening shift and the midnight shift. While lawyers for the Board now insist that of the two the evening, rather than the midnight shift, was preferable, there

---

10. One difficulty is the Board's confusing contradictions. Thus it found that Nowak "was actually offered by the Company the job of a bulldozer operator * * *." But elsewhere it found that "there was now no bulldozing, except by the clam operators themselves. * * *."

In defense of the Board's order, great stress is put on the single isolated phrase of a single isolated answer to a single question. In response to the question,

"Did you relieve anybody on [the midnight] shift?", the answer was, "Yes, I went on the push-up job * * *." If reference to "push-up job" is to imply that the midnight shift was for bulldozing only, this is certainly not enough to overcome the total record showing without any real dispute that the physical operations had been changed to provide "clamming" around the clock.

is no evidence to support this. For all this record teaches the midnight shift is better, or the equal of the evening shift. Since the same job was no longer available, the closest equivalent had to be found. The job offered was substantially equivalent employment. That is all the law requires. N. L. R. B. v. Biscayne Television Corp., 5 Cir., 1961, 289 F.2d 338; N. L. R. B. v. American Steel Building Co., 5 Cir., 1960, 278 F.2d 480; N. L. R. B. v. Trinity Valley Iron and Steel Co., 5 Cir., 1961, 290 F.2d 47.

Order enforced in part and in part denied.