**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CITIZENS HOTEL COMPANY, d/b/a Hotel Texas, Respondent.**

No. 20326.

United States Court of Appeals Fifth Circuit.

Jan. 15, 1964.

502

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Allen M. Hutter, Atty., N. L. R. B., for petitioner.

G. W. Parker, Jr., Karl H. Mueller, Harold E. Mueller, Attys., Stone, Parker, Snakard, Friedman & Brown, Mueller & Mueller, Fort Worth, Tex., for respondent.

Before TUTTLE, Chief Judge, and BROWN and GEWIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This case began when the Employer decided to end the practice of giving a Christmas bonus. Based on the undenied fact that in 1961, the Employer [1] did not give to the employees of the Hotel Texas the Christmas bonus customarily given

1. The Employer is Citizens Hotel Company, a corporation, which as its principal activity operates the Hotel Texas, a large downtown hotel in Fort Worth. It also operates a garage, a parking lot, and a bank annex adjacent to the hotel.

for over 14 years, the Board found violations of § 8(a) (5) for failure to bargain on the theory that this was an impermissible unilateral change. On the further finding that the discontinuance of the bonus was intended to, and in fact did, discriminate against employees because of their membership in, and the recent certification of, the Union,[2] the Board also held the Employer guilty under § 8(a) (3). A finding of a § 8(a) (1) violation followed both. Besides the usual cease and desist order, the Board affirmatively required the payment of a 1961 Christmas bonus on the same terms followed by the Employer in 1960. We enforce as to § 8(a) (5) and the § 8(a) (1) charge related thereto, but deny enforcement as to § 8(a) (3).

■ The Employer makes the usual contention that being a Christmas bonus, the money disbursed is a pure gift and therefore not a bargaining matter of wages, hours, and other terms and conditions of employment. 29 U.S.C.A. § 158(d).[3] There is considerable evidence including that concerning the manner in which the "gifts" were handed out in many years which sustains this view. But considering the regularity of the gift, the existence of a formal policy as to the eligibility of recipients and ascertainment of the dollar amounts, pre-employment reference to the bonus as an inducement to prospective employees, and the like, we think this was a matter essentially for factual determination by the Board. We therefore sustain the Board's factual conclusion, based upon adequate evidence, that the Christmas bonus was a bargainable matter. N. L. R. B. v. Niles-Bement-Pond Co., 2 Cir., 1952, 199 F.2d 713; N. L. R. B. v. Wheeling Pipeline, Inc., 8 Cir., 1956, 229 F.2d 391, 392; Singer Manufacturing Co. v. N. L. R. B.,

7 Cir., 1941, 119 F.2d 131, 136, cert. denied, 1941, 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549; N. L. R. B. v. Electric Steam Radiator Corp., 6 Cir., 1963, 321 F.2d 733, 736; cf. Richfield Oil Corp. v. N. L. R. B., 1956, 97 U.S.App.D.C. 383, 231 F.2d 717, 724, 58 A.L.R.2d 833, cert. denied, 351 U.S. 909, 76 S.Ct. 695, 100 L.Ed. 1444; W. W. Cross & Co. v. N. L. R. B., 1 Cir., 1949, 174 F.2d 875, 878.

Thus far no detailed discussion of the evidence has been required. But whether the discontinuance was a failure to bargain, and if so, whether it was something substantially more as a discriminatory or coercive action calls for a more extended treatment.

The Hotel Texas is, to say the least, an unusual business. In its long history from 1921, it has never showed a profit, and hence has never had to pay a single dollar in federal income taxes. In retrospect, this experience seems to confirm what its founders apparently assumed—the hotel was essentially a civic enterprise. That was the way it came into being. In order to build and assure an adequate hotel for the city's future, the corporation was organized and its stock subscribed by leading businessmen of Fort Worth, 15 of whom thereafter were its directors. Among these businessmen was Amon Carter, who served as a vice president. For a period of time it was operated by a lessee, but following bankruptcy the hotel was taken back by the original directors in 1934. For a number of years (1936 to 1946), the hotel was leased to, managed and operated by the Moody interests as a part of the National Hotel affiliated chain. In 1946 Amon Carter, then a newspaper publisher and one of Fort Worth's outstanding citizens, purchased all of the outstanding stock

---

2. Local 748, Hotel and Motel Cooks, Waiters, Waitresses, and Bartenders, Hotel and Restaurant Employees and Bartenders International, AFL-CIO.

3. See also 29 U.S.C.A. § 159(a) which provides:
   "(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment."

of the corporation, and in turn gave or sold a one-half interest to Sid Richardson, likewise a man of great prominence, wealth and leadership in the community. During that year the Moody lease was bought up and in March 1947 the corporation, Citizens Hotel Company, resumed control of the hotel. It has operated the hotel since that time.

In December 1946, after Amon Carter had acquired ownership of the stock of the corporation but while Moodys were still the operating lessee, a Christmas bonus was distributed to the hotel employees as had been done for a number of years. On ascertaining that the Moody bonus had been 10%, Amon Carter thought this insufficient and ordered a separate payment of an additional 6%. Though in no sense an employer in 1946, the corporation obtained a bank loan of $20,000 needed for this purpose. From that time on down to December 1961, the employees received a Christmas gift each year. And in each instance, except one, the money needed was borrowed from a bank. The single exception was the adverse year 1960 in which some airport bonds were redeemed and this converted capital was used to pay the bonus.[4]

Although the exact time does not appear, as early as 1954 a policy formula was adopted as to persons eligible and amounts payable for the Christmas bonus. There were three categories: (1) a two weeks' base pay for those on the payroll January 1 who worked for the balance of the year; (2) one week's base pay for those on the payroll July 1 who worked for the rest of the year; and (3) 3.846% of earnings for those hired after July 1 but before December 1. But in 1958, with mounting cumulative losses and nonexistent profits, management reduced each of these bonuses by one-half.[5] Bonuses at these reduced rates were given in 1959 and 1960.

Following their regular practice of reviewing each fall the current and future prospects for the business, the directors met informally in early October 1961. At this meeting the directors concluded that no bonus would be granted for Christmas 1961. The various department heads were accordingly advised with instructions to pass the word to the employees of their respective departments. For purposes of the § 8(a) (5) charge, a detailed discussion of the financial evidence on losses is not required. It suffices merely to state that the evidence is both uncontradicted and vivid in showing regular, continuous losses in large cumulative amounts.

Whether this meeting with its no-bonus announcement preceded or followed the October 6, 1961, Board certification of the Union is not clear. The Examiner fixed it after, but we doubt that it matters. Management was aware, of course, of the results of the recent election and this was enough to trigger anti-union action if that was the real motive. And as to bargaining, the long time remaining between October and December 20–25 could substantiate an obligation on the Employer's part at least to reconsider the decision. In any event, in late October in connection with its request for bargaining, the Union served the Employer with a list of its demands. These included Clause 9[6] guaranteeing continuation of all current employee benefits. Formal bargaining sessions were held on December 13. It is uncontradicted that the Employer's attorney, its chief negotiator, undertook in those negotiations

4. By 1961 the outstanding unpaid balance of the bank loans made for the payment of Christmas bonus was $200,000.

5. With Sid Richardson's death in 1958 and Amon Carter's in 1955, ownership of 99% of the corporate stock was thereafter in the Sid Richardson Foundation and the Amon Carter Foundation (see Campbell v. Carter Foundation, 5 Cir., 1963, 322 F.2d 827).

6. Clause 9 read: "No employee shall, as a result of signing this agreement, suffer a reduction in his wages or an increase in hours, nor be deprived of any established and recognized benefits or privileges in excess of or more advantageous than the contract provisions."

to determine just what current benefits the Union had in mind under Clause 9. At no time did the Union representative bring up or even as much as mention the Christmas bonus. Two days later, on December 15, the Employer's representative and the Union representative (its counsel) had further discussions primarily as to the selection of a convenient time for deferred bargaining meetings. At that time the Union attorney stated that he "understood that there had been some signs posted within the hotel * * * stating that there would be no Christmas bonus * * *" for 1961, and if that was true, the Union would have to file charges with the Board. A charge was filed on January 3, 1962, asserting that "on December 15, 1961," the Employer refused to bargain and "since" that "date * * * has unilaterally withheld the annual Christmas Bonus * * *." By an amended charge the discontinuance of the bonus was pinpointed at "on or about December 25, 1961." To complete the story, it is also uncontradicted that at the later bargaining session of February 7, 1962, when the Employer's representative again undertook to ascertain what benefits the Union sought to be continued by Clause 9, he specifically asked whether this included the Christmas bonus. To this the Union representative replied, "We don't want to discuss that. We will see you in court on that in March." [7]

On this the Employer makes a very persuasive argument that despite the change in a prior practice, there has been no real failure to bargain, either technical or more substantial. Rather, its argument proceeds, these facts show that the Christmas bonus was seized upon by the Union to secure the advantage of a cease and desist order whereas its conduct indicates that it had no real desire to negotiate—that is, discuss—the problem in December. A subsidiary element of that approach is the undisputed availability of ample *time* for fur-

ther discussion before it was too late, i. e., Christmas 1961.

Nevertheless we do not think that the Employer's contention can be sustained in the light of the implied findings of this record. It is true, of course, as recently pointed out in N. L. R. B. v. Tex-Tan, Inc., 5 Cir., 1963, 318 F.2d 472, 479–481, that an employer may make changes without the approval of the union as the bargaining agent. The union has no absolute veto power under the Act. Nor do negotiations necessarily have to exhaust themselves to the point of the so-called impasse. But there must be discussion prior to the time the change is initiated. An employer must at least inform the union of its proposed actions under circumstances which afford a reasonable opportunity for counter arguments or proposals. Here, of course, there was no such discussion. The Employer was willing to talk. It apparently tried to find out what the Union had in mind. But the fact is that at no time after the moment the law required the Employer to bargain did it ever advise the Union of what it proposed to do this Christmas—i. e., pay no bonus.

There was, therefore, an impermissible unilateral change constituting a failure to bargain. May Department Stores Company v. N. L. R. B., 1945, 326 U.S. 376, 385, 66 S.Ct. 203, 209, 90 L.Ed. 145; N. L. R. B. v. Katz, 1962, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230; N. L. R. B. v. J. H. Rutter-Rex Manufacturing Co., 5 Cir., 1957, 245 F.2d 594, 597; N. L. R. B. v. American Aggregate Co., Inc., 5 Cir., 1962, 305 F.2d 559, 562; cf. N. L. R. B. v. Crompton-Highland Mills, 1949, 337 U.S. 217, 224, 69 S.Ct. 960, 963, 93 L.Ed. 1320. But this refusal to bargain must here be characterized as a "technical" one in the sense that although the action violates the law because of its consequences, it was not an instance of deliberate, purposeful refusal to engage in negotiation having the gen-

---

7. The hearing was held March 26, 1962, pursuant to formal complaint dated January 31, 1962.

uine aim of bringing about an agreement. We put emphasis on this because the actual nature of the failure to bargain bears significantly on the remedy to be imposed by the Board.

■ This nature of the § 8(a) (5) violation is relevant also to the § 8(a) (3) charge and to that of § 8(a) (1) based thereon. Evidence and a finding that an employer is actively engaging in conduct for the purpose of frustrating agreement, either by an outright refusal to talk, cf. N. L. R. B. v. American Aggregate Co., Inc., 5 Cir., 1962, 305 F.2d 559, 562, or prolonged insincere discussions, cf. N. L. R. B. v. Herman Sausage Co., Inc., 5 Cir., 1960, 275 F.2d 229, 232, carry with them the seeds of anti-union motivation. But here the impermissible unilateral change constituting a § 8(a) (5) violation does not, standing alone, have any earmarks of such a purpose. If they are to be found, they must be found elsewhere than in the manner of the change—that is, unilateral without prior discussion.

■ When looked at in this light, we do not think the record supports this § 8 (a) (3) finding and the § 8(a) (1) finding related thereto. No contention is, or can be, made that there is any direct evidence of anti-union motivation such as threats, coercive statements, or declarations made indicating that this action was a reprisal for the September election victory of the Union. The evidence on this was all one way. The secretary of the Employer and the hotel manager testified that nothing was said at the October directors' meeting to link the bonus decision to unionization. Likewise, the record was not only uncontradicted, it was overwhelming, that the hotel was suffering great and increasing losses. The Examiner, whose decision the Board adopted without more, rejected these contentions. He sought to put these in a category of fact finding by reciting that "I

do not credit the testimony and contentions on behalf of * * * [the Employer] that it discontinued the bonus solely because of unfavorable financial conditions." [8]

■ But to characterize the conclusion as a fact finding or to cite Walton does not alone carry the day. See N. L. R. B. v. Walton Mfg. Co., 5 Cir., 1963, 322 F.2d 187; cf. Dobbs Houses, Inc. v. N. L. R. B., 5 Cir., 1963, 325 F.2d 531. The Examiner seemed to recognize that this credibility resolution was not a run-of-the-mill fact controversy. He did not, for example, even remotely suggest that he found these businessmen witnesses to be untrustworthy of belief or consciously testifying to a falsehood. In the final analysis, his rejection of the Employer's contention rested on three things. The first was that the financial conditions were no worse in 1961 than they were the year before (1960) and, to the contrary, the company had made extensive improvements indicating optimism for the future. The second was that despite these losses, the salaries of the hotel manager and his two assistants were raised. The third was that the Employer had been found guilty of § 8(a) (1) and (3) violations in an earlier case. N. L. R. B. v. Citizens Hotel Company, 5 Cir., 1963, 313 F.2d 708, enforcing 131 N. L. R. B. 834.

■■ Of course prior violations may have relevance on motivation.[9] But, as our previous decision reflects, the earlier case occurred in 1960 during organizational activities. Moreover, the actions condemned were those of supervisory personnel whose duties charged the Employer with legal consequences, but whose position of responsibility is in no way comparable to that of the directors of the company here involved. Except the bare citation of the earlier case and the facts summarized in the decision of the Board

8. To this the Examiner in footnote 29 merely stated: "See N. L. R. B. v. Walton Manufacturing Co. et al. [1962], 369 U.S. 404 [82 S.Ct. 853, 7 L.Ed.2d 829]."

9. See, e. g., Paramount Cap Mfg. Co. v. N. L. R. B., 8 Cir., 1958, 260 F.2d 109, 112–114; N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 1953, 205 F.2d 131, 139–140, cert. denied, 1953, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391.

and this Court, there is no indication that because subordinate representatives took certain action in 1960 in opposition to union organizational activity, the directors were following a like course in 1961 after the outcome of that drive was an accomplished fact. Nor, in order to show a substantial relevance, is it enough to point, as does the Board, to statements candidly made that the directors felt a sort of disappointment that employees after many years of apparent satisfaction with direct dealings between labor and management presumably decided that a union was needed to represent their interests. That reaction is certainly an understandable one. But to hold such a feeling is not a violation of the law. An employer does not have to like unions, or the idea of unionization. It is enough that he obey the law. N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 409.

Raising the manager's salary and that of his two chief assistants is likewise inconsequential. To begin with, it is uncontradicted that the manager's compensation was raised because of added substantial duties resulting from the expansion and rehabilitation program. Except that the raises for the two assistant managers were not given for that same reason, the record as to them is barren. It was not up to the Employer affirmatively to establish why these raises were given. Many reasons can be supposed, including perhaps problems growing out of unionization or the pressures of trying to make ends meet with declining patronage, increased costs and competition or the like.

The last and only remaining factor leading to the Examiner's credibility resolution is, in the circumstances of this record, an unusual one. It boils down to this proposition. Granted that losses were continuous and increasingly greater, both annually and cumulatively, only anti-union animus can account for the 1961 no-bonus decision because the losses for that year were not much worse than in 1960, and despite them a bonus was nevertheless paid. To shore this up, emphasis is also put on the modernization program which, so the argument runs, would not have been undertaken had the financial future been as bleak as the Employer claimed in the hearing and before us. From a legal standpoint, the argument is equivocal at best for in essence it undertakes to assay the *reasonableness* of the Employer's conduct. That, however, is not a function of the Board. N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 413. The supposed unreasonableness is legally significant only insofar as the facts permit a supportable inference which negatives all reasons other than anti-union motivation. But that requires that there be a supportable inference that the action in question was unreasonable. That test is not met here.

As we stated earlier, the hotel was a losing proposition from the beginning. It never made a profit, never paid income tax, and never earned, declared or paid out a dividend. Long prior to the time when there was any occasion for suspicion about anti-union feeling on management's part, the directors had drastically reduced the Christmas bonus. This reduction occurred in 1958 when, in contrast to the losses of 1960 and 1961, those for the immediate preceding years were modest in nature.[10] The losses continued in 1959 at about this same rate and then jumped spectacularly in 1960.[11] In the meantime, of course, Christmas bonuses even at the reduced scale were paid out of capital, those of 1960 being paid from some airport bonds which had been called. With the marked jump in losses during 1960, the only reasonable thing is that management properly had great concern during 1961 for financial operations of that year. Consideration of those facts,

---

10. The losses for the preceding years were:

| Year | Losses |
|------|--------|
| 1956 | $44,741.23 |
| 1957 | 37,905.50 |
| 1958 | 15,452.81 |

11.

| Year | Losses |
|------|--------|
| 1959 | $ 28,811.47 |
| 1960 | 133,355.67 |

either currently or at year's end, graphically warned that things were getting worse, not better.[12] Based on this operating experience and the current poor rate of occupancy [13] the fiscal advisors to management predicted a loss of $125,000 but when the figures were all in, that result was also worse, not better, than predicted. For those operations produced a year end loss to the corporation of $133,986.77, an amount which exceeded both the preceding year's losses and the aggregate of the losses for the years 1956 through 1959.[14] Thus in the short span of two years, losses exceeded a quarter of a million dollars, a good portion of which were attributable to the expansion-rehabilitation program. This program, completed in the fall of 1961, resulted in substantial increase in interest and depreciation costs, but, at that early date, no substantial increase in operating revenues.[15]

In the face of these mounting losses, the history of continuous unprofitable operations, the necessity for invading capital or borrowing money by which to pay the Christmas bonus, we cannot find any substantial basis for reading into the 1961 no-bonus decision a purpose to discriminate against or discourage membership in the Union. The act of discontinuance is not enough. To justify these charges anti-union purpose must be established, and it is lacking here. N. L. R. B. v. W. L. Rives Co., 5 Cir., 1961, 288 F.2d 511, 516; N. L. R. B. v. Dalton Brick & Tile Corp., 5 Cir., 1962, 301 F.2d 886, 898; N. L. R. B. v. Intracoastal Terminal, Inc., 5 Cir., 1961, 286 F.2d 954.

We recognize, of course, that there are circumstances in which, to effectuate the dominant policy of collective bargaining in good faith, a restitution order is permissible or required.[16] But we do not think that in the situation revealed by this record of a § 8(a) (5) violation based solely on an impermissible unilateral change justifies the order here made. The violation of the Employer was the failure to discuss this one matter before taking action. The record shows no further or other obstruction, technical or otherwise, to bargaining. The Employer under the Order as enforced now has to bargain as it should have earlier done. Whether agreement will be forthcoming, no one can yet say. The negotiations may result in a satisfactory disposition of this Christmas bonus issue. If so, the agreement will afford its own redress. If not, and assuming this results after good faith bargaining, the Employer will in no sense be "benefiting by his mis-

---

12. The cumulative losses in 1961 were:

| As of | |
|---|---|
| August 31 | $60,673.38 |
| September 30 | 74,568.36 |
| October 31 | 79,062.65 |
| November 30 | 99,522.83 |

13. The occupancy rate for the three months preceding the October meeting was:

| 1961 | Percentage |
|---|---|
| July | 56.5 |
| August | 37.9 |
| September | 45.8 |

14. Since our case deals with bonus for hotel employees only, the result was even worse than this. For the hotel operations produced a loss of $181,602.30 which was partially offset by profits from the corporation's two other activities.

15. These improvements costing in the neighborhood of $1,400,000 added a mortgage debt of like amount to the $1,000,000 still due under an earlier mortgage plus the bank loans of approximately $200,000.

The Examiner made much of the fact that in December 1961 and February 1962, the hotel showed an "operating" profit prior to deduction for interest or depreciation. With actual interest payments of $46,628.83 in 1961 on the improvement financing and a monthly interest obligation thereafter of $10,034.00 we have difficulty in following the Examiner's rationale.

16. See Town & Country Mfg. Co. v. N. L. R. B., 5 Cir., 1963, 316 F.2d 846, 847; N. L. R. B. v. Intracoastal Terminal, Inc., 5 Cir., 1961, 286 F.2d 954, 959; N. L. R. B. v. Electric Steam Radiator Corp., 6 Cir., 1963, 321 F.2d 733, 738; East Bay Union of Machinists Local 1304 v. N. L. R. B., D.C.Cir., 1963, 322 F.2d 411, 415; N. L. R. B. v. Central Illinois Public Service Co., 7 Cir., 1963, 324 F.2d 916.

deed." N. L. R. B. v. J. H. Rutter-Rex Mfg. Co., 5 Cir., 1957, 245 F.2d 597–598. Under the conditions discussed, the "practical needs," N. L. R. B. v. Seven-Up Bottling Co., 1953, 344 U.S. 344, 351, 352, 73 S.Ct. 287, 291, 97 L.Ed. 377, of this record do not reasonably call for a mandatory restitution order. Nor is such an Order "adapted to the situation which calls for redress," N. L. R. B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 348, 58 S.Ct. 904, 82 L.Ed. 1381. All that is needed to "effectuate the policies of this Act," 29 U.S.C.A. § 160(c), is to require that the Employer now bargain in good faith.

Enforcement denied in part.

Enforced in part.