RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0007P (6th Cir.)
File Name: 04a0007p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ISHIKAWA GASKET AMERICA,
INC.,

       *Petitioner/*
*Cross-Respondent,*

       *v.*

NATIONAL LABOR RELATIONS
BOARD,

       *Respondent/*
*Cross-Petitioner.*

Nos. 02-1167/1310

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
No. 8-CA-31292.

Argued: October 21, 2003

Decided and Filed: January 7, 2004

Before: MARTIN and SUTTON, Circuit Judges; MILLS,
District Judge.[*]

_____

[*] The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

_____

## COUNSEL

**ARGUED:** Maurice G. Jenkins, DICKINSON, WRIGHT, PLLC, Detroit, Michigan, for Petitioner. David Seid, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** Maurice G. Jenkins, Jennifer K. Nowaczok, Paul R. Bernard, DICKINSON, WRIGHT, PLLC, Detroit, Michigan, for Petitioner. David Seid, Aileen A. Armstrong, Frederick C. Havard, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. Ishikawa Gasket America, Inc. seeks review of the National Labor Relations Board's decision that it violated section 8(a)(1) and (3) of the National Labor Relations Act (29 U.S.C. § 158(a)(1) and (3)), by reducing its annual bonus for hourly production employees during a union organization effort. The Board cross-applies to enforce its order. For the following reasons, we affirm.

I.

The facts are well documented in the administrative law judge's report, which was adopted and incorporated in the Board's order. The facts relevant to this Court's review, however, are summarized as follows.

Ishikawa Gasket America, Inc., a wholly-owned subsidiary of Ishikawa Gasket of Japan, Inc., manufactures head and manifold gaskets for the automotive industry at its production facility located in Bowling Green, Ohio. Ishikawa's administrative offices are located in Farmington Hills, Michigan. The Bowling Green facility began operations with

only twelve employees, but has since grown to more than two hundred employees. Prior to the acquisition by the International Association of Machinists and Aerospace Workers, AFL-CIO, of an interest in Ishikawa's employees, an attempt to organize the employees occurred in October 1997, and a second attempt occurred approximately a year later.

In 1999, Ishikawa employees began another attempt to organize and Ishikawa's reaction to this campaign gave rise to this litigation. Apparently, the organization attempt coincided with internal management disputes and the development of two management factions, which were chief among the employees' complaints. The campaign against the union organization started at the top with President Tsunekazu Udagawa's command that the supervisors "must not let this drive[] succeed at any cost. You must stop it, period." Many of the supervisors shared President Udagawa's distaste for unions and began a relentless campaign against the union and those who supported the cause.

Examples of Ishikawa's repeated attempts to dissuade union supporters are well preserved in the record, but a few bear mention. Notably, supervisor Dave Kendrick convinced employees to surveil the union activities that were occurring and promised them compensation in return. Joe Makowski, Vice President of Manufacturing in charge of the Bowling Green facility, compiled a list of pro-union and anti-union employees and later looked to it to develop ways to "put a stop to the Union." Much of the surveillance focused on employee Julie Wilson, the person who spearheaded the campaign for union representation or, as Makowski called her, the "pain in the [expletive]"or the "Union antagonist." Upon Ishikawa's direction, the supervisors removed union literature located in the production facility. Indeed, Kendrick and other managers began making a "morning walk-through" to discover and remove any union paraphernalia.

Additionally, Makowski and Kendrick created a racist leaflet and constructed it so that it appeared to be authored by the union with the intention that it would dissuade employees from organizing. The document referred to the "Japs bomb[ing] Pearl Harbor" and stated that, "We give you your own bomb to drop on the sneaky BASTARDS!!!" Finally, the supervisors began an unprecedented practice of soliciting the employees' complaints and after discovering that the employees' chief complaint was the management, Vice President Masanori Yamanami fired several supervisors including Kendrick and Makowski.

On November 30, the Union filed a petition to represent Ishikawa's employees. Two days prior to the election to determine whether the union would represent the employees, President Udagawa reminded the employees that their complaints were taken care of and there was no reason for a union. A stipulated election was held on January 21, 2000 and the employees overwhelmingly voted against the union.

A consolidated complaint alleging various violations of the National Labor Relations Act was filed on October 30, 2000. Relevant to this appeal, the complaint specifically alleged that Ishikawa reduced its annual Christmas bonus from fifteen cents per hour worked in a forty-hour work week to thirteen cents per hour worked in a forty-hour work week and that the reduction was based upon and in retaliation for the employees' organization attempt.

The administrative law judge found that Ishikawa had violated section 8(a)(1) of the National Labor Relations Act (29 U.S.C. § 158(a)(1)) by chilling the efforts to organize, soliciting employee grievances in an attempt to persuade employees that a union was unneeded, surveilling the employees' union activities, distributing inflammatory literature, and discriminatorily warning and suspending Wilson and terminating her employment because of her union activities and because she had previously filed charges with the Board. Finally, the administrate law judge found that

Ishikawa violated section 8(a)(1) and (3) of the Act by reducing the employees' bonuses because of their union activities.

With slight modifications, the Board adopted the administrative law judge's findings. The Board issued an order which required Ishikawa to cease and desist its unfair labor practices and to post a remedial notice that stated that it had violated the Act and explained the rights of the employees. Additionally, the Board required that Ishikawa reinstate Wilson and make her whole for any losses she suffered, and to make the production employees whole for the unlawful reduction in the Christmas bonus. Ishikawa appeals only the Board's decision that Ishikawa's reduction of the employees' bonuses violated the Act. The National Labor Relations Board cross-applies to enforce its order issued against Ishikawa. Because Ishikawa failed to challenge the Board's findings with respect to all other violations of the Act beside the bonus issue, we conclude that the Board is entitled to summary enforcement of the Board's findings that went unchallenged. *See N.L.R.B. v. Gen. Fabrications Corp.*, 222 F.3d 218, 231-32 (6th Cir. 2000).

II.

A.

This Court's review of the Board's decision is limited. The Board's findings of facts are conclusive unless they are unsupported by substantial evidence. *Id.* at 225. Substantial evidence exists when the evidence is "adequate, in a reasonable mind, to uphold the [Board's] decision." *Id.* (internal quotations and citations omitted). When presented with conflicting factual inferences, this Court is not at liberty to draw an inference different from the inference drawn by the Board. *Stark Ceramics, Inc. v. N.L.R.B.*, 375 F.2d 202, 205 (6th Cir. 1967). The Board's determination that Ishikawa was motivated by an improper purpose in its decision to reduce the Christmas bonus is a question of fact that may be

overturned only if it is unsupported by substantial evidence, even if this Court were to draw a contrary conclusion had it engaged in *de novo* review. *See id.; Gen. Fabrications Corp.*, 222 F.3d at 225.

An employer runs afoul of 29 U.S.C. § 158(a)(1) when it engages in conduct that is designed to "interfere with, restrain, or coerce employees in the exercise" of their right to organize. Relatedly, an employer commits a violation of 29 U.S.C. § 158(a)(3) when it discriminates in the terms or conditions of employment as a means of discouraging union membership. This Court has adopted a burden-shifting approach to determine whether anti-union animus motivated an employer's decision. *See Gen. Fabrications*, 222 F.3d at 226. First, the Board must establish a prima facie case by demonstrating that "the employee's protected activities were a motivating factor in the employer's decision." *Id.* Second, the burden shifts to the employer to demonstrate by a preponderance of the evidence that it would have made the same decision regardless of the fact that the employees engaged in protected activity. *Id.*

B.

Ishikawa argues that it made its decision to reduce the annual bonus before it was aware of the organization attempt and, therefore, its decision could not have been motivated by anti-union animus. In support of this assertion, Ishikawa points to an electronic message dated November 16, 1999, in which President Udagawa and Vice President Yamanami discussed decreasing the amount of the bonuses. The record, however, belies this argument. We find that there is substantial evidence in the record which demonstrates that Ishikawa made its decision fully aware that its employees were attempting to organize.

As an initial matter, Ishikawa makes no attempt to overcome Yamanami's testimony that when considering whether to reduce the bonuses he considered the union

activity "very seriously." This statement alone demonstrates that Ishikawa was clearly aware of the ongoing union organization attempt when it made its decision. Additionally, when asked whether at "the time you made the decision to reduce the bonuses, [was he] aware that there was a Union organizing drive going on at the Bowling Green plant," Yamanami replied: "Yes, I do."

Moreover, Yamanami testified that he had not made his final decision to reduce the bonuses until late November. At that time, Ishikawa was not only aware of the union activity, but had launched the campaign against the union. Indeed, by late November, Wilson had conducted two union meetings from her home that Ishikawa's supervisors had instructed anti-union employees to monitor. Additionally, by late-November the supervisors had begun to take down union literature located in the Bowling Green facility.

Furthermore, the record demonstrates that as early as November 2 the management knew of the union organization attempt. On that date, Kendrick had confirmed his suspicions that the employees were attempting to organize and in a meeting shortly after this confirmation, President Udagawa made his statement that the supervisors "must not let this drive[] succeed at any cost. You must stop it, period." Thus, we find Ishikawa's argument that it made its decision to reduce the bonus without knowledge that the employees were attempting to organize unpersuasive in light of the substantial evidence in the record to the contrary.

## C.

Ishikawa also argues that the fact that it also reduced the managers' bonuses and at a much higher rate, fifty percent, negates the Board's conclusion that the decision to reduce the employees' bonuses was based upon an anti-union motivation. Further, Ishikawa argues that because the Board accepted the conclusion that the decision to reduce the managers' bonuses was because of the management factions,

then this Court must find that Ishikawa's decision to reduce the employees' bonuses was motivated by that same concern. As Ishikawa argues, "[g]iven the pervasive affect [sic] of factionalism throughout the Bowling Green facility, there is no way to separate the decision to reduce the managers' bonuses from the decision to reduce employee bonuses." Additionally, Ishikawa argues that if the factions were the real reason to reduce the managers' bonuses then there would be no reason to also reduce the managers' bonuses at the Farmington Hills, Michigan, facility because the factionalism was only a problem at the Bowling Green facility. Again, we find Ishikawa's arguments unpersuasive.

First, we note that regardless of Ishikawa's motivation for reducing the managers' bonuses, there was substantial evidence in the record that demonstrates that the decision to reduce the employees' bonuses was motivated by Ishikawa's desire to chill protected activity. Stated differently, Ishikawa's motivation for reducing the managers' bonuses is simply irrelevant to its motivation for reducing the employees' bonuses. With that said, however, the record demonstrates that the decision to reduce the managers' bonuses was made because of the factionalism and performance related reasons, which are legitimate reasons to reduce the bonus. Yamanami himself testified that when determining whether to pay bonuses to its management, it considered the managers' performance. Specifically, Yamanami stated: "for the managers, we determine the bonus by the performance." As the Board noted, the management was "the area where Yamanami had his main problem," whereas there was no such legitimate explanation to reduce the employees' bonuses. Second, Ishikawa presents no evidence to demonstrate that Ishikawa had ever before treated its management and production employees differently determined by whether they worked at the production facility or the administrative facility. Instead, the only evidence we have before us suggests that Ishikawa was group-minded, as opposed to facility-minded.

In sum, we find that substantial evidence supports the Board's finding that Ishikawa's anti-union animus motivated its decision to reduce the employees' bonuses.  Indeed, the most crucial piece of evidence demonstrating Ishikawa's motivation in reducing the bonus went uncontradicted by Ishikawa in its brief presented to this Court.  That is, Ishikawa announced its decision to reduce the employees' bonuses, on the heels of its statement that "the Japanese take the posting of flyers for a Union as threat [sic] and they wouldn't tolerate any third party coming into their plant."  At oral argument, however, Ishikawa suggested that the statement that it was going to reduce the employees' bonuses actually came before the statement regarding the posting of union flyers. Regardless of which statement preceded the other, Ishikawa has made no effort to explain the linking of these two statements and how this Court could construe their linking as anything other than that Ishikawa made its 1999 bonus reduction decision because of the union organization events. Ishikawa's silence on this issue is deafening and we conclude that Ishikawa's decision to reduce the employees' bonuses was unlawfully motivated.

## III.

Ishikawa has presented the defense that it had a legitimate business reason for its decision, and thus, it would have made its decision to reduce the employees' bonuses even absent any anti-union motivation.  Ishikawa argues that its deteriorating financial condition motivated its  decision to reduce the employees' bonuses.  Ishikawa relies on *National Labor Relations Board v. Citizens Hotel Company*, 326 F.2d 501 (5th Cir. 1964), in support of this argument.  In *Citizens Hotel*, the Fifth Circuit found that even though the Hotel had established a practice of paying its employees a Christmas bonus, its decision to end the practice did not establish an anti-union motivation in light of the Hotel's financial situation. *Id.* at 506. We find Ishikawa's reliance on *Citizens Hotel* misplaced.

First, in *Citizens Hotel* the Board found no direct evidence of anti-union motivation, whereas in this case there was abundant evidence of anti-union motivation. *Id.*  Second, in *Citizens Hotel* the court described the evidence of the Hotel's deteriorating financial condition as "overwhelming" evidence that "the hotel was suffering great and increasing losses." *Id.* In this case, however, the Board found that Ishikawa was less than forthcoming about its financial situation and what little financial information that Ishikawa had presented actually showed an improvement in productivity and profitability. Indeed, the sparse financial information that Ishikawa provided showed increased sales from $26,205,587 in 1998 to $28,948,426 in 1999.  Also, the net losses decreased from $4,495,729 in 1998 to $2,019,904 in 1999.  Although the financial information demonstrated that the accumulated deficit continued to grow, the minimal information that Ishikawa provided left the Board without an explanation or a way in which the Board could distinguish "how and why [Ishikawa] established its bonus in past years as compared with 1999 and [how] it established that it would have decreased an admitted incentive based bonus when in fact the financial results for 1999 show apparent success in that it had a major profit gain over the previous year."

We find that Ishikawa has not met its burden of establishing by a preponderance of the evidence that it would have made the same decision regardless of the fact that its employees were engaged in protected activity. *Gen. Fabrications Corp.*, 222 F.3d at 226.  Ishikawa's asserted business justification is simply unpersuasive in light of its increased productivity and profitability and because even the sparse financial information that Ishikawa had provided warned of its lack of reliability. Indeed, the letter introducing the financial information warns that "[w]e have not audited or reviewed the accompanying financial statements and, according[ly], do not express an opinion or any other form of assurance on them."

Based on the foregoing, we AFFIRM the decision of the Board and GRANT the Board's petition for enforcement of its order.